Case No. 13-1604

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

BRIAN W. SEXTON,
      Plaintiff/Appellant,

v

PANEL PROCESSING, INC., a
Michigan corporation and PANEL
PROCESSING OF COLDWATER,
INC., a Michigan corporation,
      Defendants/Appellees.

---

On Appeal from Final Judgment of the United States District Court
For the Eastern District of Michigan – Northern Division (Ludington, Thomas L.)
Civil Action No. 1:12-cv-10946

---

## Brief of Defendants – Appellees

---

Steven J. Fishman (P13478)
Donald H. Scharg (P29225)
David A. Malinowski (P72076)
Attorneys for Defendants/Appellees
BODMAN PLC
201 W. Big Beaver Road
Suite 500
Troy, MI 48084
(248) 743-6000
sfishman@bodmanlaw.com
dscharg@bodmanlaw.com
dmalinowski@bodmanlaw.com

## DISCLOSURE OF CORPORATE AFFILIATION
## AND FINANCIAL INTEREST

Appellees Panel Processing, Inc. and Panel Processing Coldwater, Inc., pursuant to 6th Cir. R. 26.1, make the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned company?

      No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

      No.

BODMAN PLC

By:    /s/ Donald H. Scharg
       Steven J. Fishman (P13478)
       Donald H. Scharg (P29225)
       David A. Malinowski (P72076)
201 W Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
Attorneys for Defendants-Appellees

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ................................. vi

STATEMENT OF ISSUES PRESENTED ........................................... vii

STATEMENT OF THE CASE ............................................................. 1

STATEMENT OF FACTS ................................................................. 2

SUMMARY OF THE ARGUMENT ...................................................... 10

Argument ........................................................................................ 13
    1.  The District Court Decision Is Consistent With *George* ........................ 21
    2.  *Nicolaou, Edwards,* And *King* Require Denial Of The Appeal .............. 23
    3.  *Hashimoto* and *Anderson* Should Not be Followed ............................ 29
    4.  Section 510 Should Not Be Expanded To Include Protection For
        Sexton's Email Issued Outside Of An "Inquiry" ................................ 32
    5.  Because Section 510's Definition of 'Inquiry' Means The Act Of
        Seeking Information, The Court Should Not Give A Broader
        Interpretation Of Inquiry To Include All Statements or
        Complaints Made By Employees ............................................. 34
    6.  The Secretary Is Not Entitled To Deference On His Interpretation
        Of Section 510 ....................................................................... 45

Conclusion ...................................................................................... 46

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ....... 47

Certificate of Compliance with Type-Volume Limitation ..................... 49

Troy_722694_1

# TABLE OF AUTHORITIES

**Cases**

***Adams Fruit Co., Inc. v. Barrett,*** 494 U.S. 638, 110 S.Ct. 1384 (1990)... 13, 45, 46

***Anderson v. Electronic Data Systems Corp.,*** 11 F.3d 1311 (5th Cir.1994)………
.................................................................................................. 12, 29, 30, 31

***Auer v. Robbins,*** 519 U.S. 452 (1997) ........................................................... 44, 45

***Authier v. Ginsberg,*** 757 F.2d 796 (6th Cir. 1985)................................... 35, 36, 39

**Ball v.** ***Memphis Bar-B-Q Co.,*** 228 F.3d 360 (4th Cir. 2000) ............................... 27

***Bates v. United States,*** 522 U.S. 23, 119 S.Ct. 28 (1997)................................ 43, 44

***Billoe v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.,*** 277 F.3d
882 (7th Cir. 2001) ........................................................................................ 37

***Caminetti v. United States,*** 242 U.S. 470, 37 S.Ct. 192 (1917)............................ 16

***Casias v. Wal-Mart Stores, Inc.,*** 609 F.3d 428 (6th Cir. 2012)...................... 31, 32

***Casias v. Wal–Mart Stores, Inc.,*** 695 F.3d 428 (6th Cir. 2012) ........................... 16

***Chao v. Occupational Safety Health Review Comm'n.,*** 540 F.3d 519
(6th Cir. 2008).............................................................................................. 45

***County of Oakland v. Federal Housing Finance Agency,*** 716 F.3d 935
(6th Cir. 2013) ......................................................................................... 16, 44

***Crawford v. Metro. Gov't of Nashville,*** 555 U.S. 271 (2009) ............................... 37

***Edwards v. A.H. Cornell & Son, Inc.,*** 610 F.3d 217 (3d Cir. 2010)
....................................………………11, 15, 23, 25, 26, 27, 28, 30, 31, 38 41

***Entertainment Products, Inc. v. Shelby County, Tenn.,*** 588 F.3d 372 fn3 (6th Cir.
2009) ............................................................................................................. 15

***George v. Junior Achievement of Cent. Ind., Inc.,*** 694 F.3d 812 (7th Cir. 2012)
........................................................ 11, 15, 18, 19, 23, 30, 31, 32, 33, 45, 46

***Hashimoto v. Bank of Hawaii,*** 999 F.2d 408 (9th Cir.1993) .............. 12, 29, 30, 31

Troy_722694_1

*Hatmaker v. Memorial Medical Center,* 619 F.3d 741 (7th Cir. 2010) ............... 37

*Hill v. Mr. Money Finance Co.,* 309 Fed.Appx. 950 (6th Cir. 2009)
............................................................................. .............12, 42, 42,43, 44

*Hoge v. Honda of America Mfg., Inc.,* 384 F.3d 238 (6th Cir., 2004) ............... 16

*In re Carter,* 553 F.3d 979 (6th Cir.2009).............................................................. 16

*In Re Central States Freight Corp.,* 45 F.2d 73 (6th Cir. 1930) .......................... 34

*Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478 (1990)
...................................................................... .............34, 35, 38, 35, 36, 39

*Inter-Modal Rail Employees Ass'n. v. Atchison, Topeka & Santa Fe Ry. Co.,* 520
U.S. 510 (1997)............................................................................................. 36

*Jackson v. Bd. of Edu.,* 494 Fed. Appx. 539 (6th Cir. 2009) ................................ 37

*Kasten v. Saint Gobain Performance Plastics Corp.,* 131 S.Ct. 1325 (2011)
........................................................................... ......12, 40, 41, 42, 45

*King v. Marriott Int'l, Inc.,* 337 F.3d 421 (4th Cir. 2003)........ 12,15, 23, 27, 28, 30

*Nicolaou v. Horizon Media, Inc.,* 402 F.3d 325 (2d Cir. 2005)... 11, 15, 23, 24, 25,
28, 30, 39

*NLRB v. Scriviner,* 405 U.S. 117, 92 S.Ct. 798 (1972) ....................... 12, 40, 41, 42

*North Folk,* 691 F.3d 737 ........................................................................... 45

*Peabody Coal Co. v. Dir., Office of Workers' Comp. Programs,* 718 F 3d 590 (6th
Cir. 2013)............................................................... 16, 32, 33, 34, 33, 35

*People v. Lee,* 447 Mich. 552 (Mich. 1994) ........................................................ 16

*Reiter v. Sonotone Corp.,* 442 U.S. 330 (1979) ...................................................... 15

*Sexton,* 912 F.Supp.2d at 460 ...................... 11,14, 17, 19, 20, 21, 22, 23, 25, 31, 33

*Skidmore v. Swift & Co.,* 323 U.S. 134 (1994)........................................... 44, 45

*United States v. Lumbard,* 706 F.3d 716 (6th Cir. 2013) ................................... 15

Troy_722694_1

**Statutes**

19 U.S.C. Section 1105 ................................................................ 38

29 U.S.C. Section 1059 ................................................................ 38

29 U.S.C. Section 1109(a) ........................................................... 38

29 USC 1140 ........................................................... 9, 13, 18, 33

29 USC 158(a)(4) ....................................................................... 40

**Dictionaries**

Black's Law Dictionary (www.blackslawdictionary.com) ................................. 42

Merriam-Webster Dictionary (www.merriam-webster.com) .............................. 15

The Oxford English Dictionary (www.oed.com) .................................................. 18

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellees request oral argument. This is an issue of first impression for this Court and the issue, involving the interpretation of ERISA Section 510, 29 USC 1140, has been examined by six other Circuits within unanimity in application of Section 510.

## STATEMENT OF ISSUES PRESENTED

1.     Whether Plaintiff-Appellant's claim of retaliation under ERISA Section 510, 29 USC 1140, must be dismissed because he did not provide information in an inquiry as required by Section 510.

Plaintiff-Appellant states:          No

Defendants-Appellees state:          Yes

Troy_722694_1

## STATEMENT OF THE CASE

Appellant Brian Sexton ("Sexton") is a former employee of Panel Processing, Inc. and Panel Processing of Coldwater, Inc. (jointly "Panel"). He filed a two count complaint in the Michigan Circuit Court for the County of Alpena. In Count I, Sexton alleged a retaliatory discharge under ERISA and the Michigan Business Corporation Act after his discharge by Panel on October 30, 2011, almost six months after sending an email (Sexton email, RE#9-13, Pg ID 133) challenging Panel's action in an ESOP-related election. In Count II, Sexton alleged a wrongful dismissal.

Panel removed the Complaint to federal court. After a motion for summary judgment based on Sexton's deposition, District Court Judge Thomas L. Ludington issued a written decision, dismissing Count I (ERISA Section 510 retaliation) and remanding Count II (wrongful dismissal) to the state court. (Opinion on SJ RE# 16). After Panel's motion for reconsideration of the decision to remand Count II was denied (Opinion on Reconsid RE# 21), Sexton filed the instant appeal. (Notice RE# 22).

1

# STATEMENT OF FACTS[1]

For 27 years Plaintiff Brian Sexton was employed by Defendants Panel Processing, Inc., and Panel Processing of Coldwater, Inc., (Pl. Dep. p15, RE# 9-2, Pg ID 68). At first he worked as a "fabricator, which was basically the entry level position in the shop." *Id*. Promoted several times over the years, Plaintiff eventually became the general manager of Defendants' Coldwater, Michigan facility. *Id*.

In 2003, Plaintiff was appointed to Defendants' board of directors. *Id*. Four or five years later (Plaintiff does not recall precisely when), he was appointed as a trustee of Defendants' employee stock ownership plan. *Id*. at (Pl. Dep. p15-16, RE# 9-2, Pg ID 68).

Defendants' bylaws provide that the board of directors will have seven members. (See Defs.' Bylaws art. IV, § 1, RE# 13-3, Pg ID 180). The copy of the bylaws furnished to the Court specifies that the board members "need not be

---

1    The Statement of Facts is an abridged version of the facts as stated by District Court in *Sexton*, 912 F.Supp.2d at 460-464 (RE#16 Pg ID 199-206) and updated with citation to the Record Entries. 912 F.Supp.2d at 460-464 (RE#16 Pg ID 199-206) and updated with citation to the Record Entries. In its recitation of the facts, the District Court identified Sexton as "Plaintiff" and Panel as "Defendants." Unless otherwise noted, all events occurred in 2011.

Troy_722694_1

Shareholders of the corporation," but goes on to specify that several members of the board must be insiders. (Defs.' Bylaws art. V, §§ 1-4 RE# 13-3, Pg ID 182). The chairman of the board, for example, "shall be the chief executive officer of the corporation." *Id*. § 1. The president "shall be the chief operating officer." *Id*. § 2. And the treasurer "shall have custody of all corporate funds and securities." *Id*. § 4.

A shareholders meeting must be held each year, the bylaws further provide, specifying that "[o]ne of the purposes of such meeting shall be the election of directors." (Defs.' Bylaws art. I, § 2 RE#13-3, Pg ID 175). Each share of capital voting stock entitles the record holder or proxy to one vote in the election of directors, with the bylaws elaborating:

> A majority of the outstanding shares of this corporation entitled to vote, present by their record holders in person or proxy, shall constitute a quorum at any meeting of Shareholders . . . .
>
> Each Shareholder shall, at every meeting of Shareholders, be entitled to one vote in person or by proxy for each share of capital voting stock of this corporation held by such Shareholder . . . . Directors shall be elected by a plurality of the votes of Shareholders entitled to vote at each meeting of Shareholders for the election of a Director or Directors.

(Defs.' Bylaws art. II, § 1, art. III, § 1 RE#13-3, Pg ID 177-178).

Troy_722694_1

In 1982, Defendants created their ESOP and an "employee stock ownership and money purchase pension trust." (See, Trust Agreement RE#9-7, Pg ID 96-110). The trust agreement provides that the ESOP's assets are controlled by a committee, specifying: "The Plan assets shall be invested and controlled by the Committee; provided, however, that the actual management of Trust investments, other than Company Stock, may be delegated to the Trustee." *Id*. at Pg ID 99-100. The trust agreement further provides that the committee also controls how company stock held by the trust is voted, providing:

> All Company Stock held by the Trust shall be voted by the Trustee in accordance with instructions from the Committee. Notwithstanding the foregoing, each Participant and/or Beneficiary shall be entitled to direct the voting of any voting shares of Company Stock allocated to his Company Stock Account with respect to any vote required for the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all the assets of a trade or business, or other similar transactions prescribed by regulation.

*Id*. at Pg ID 101. While the trust agreement has been furnished to the Court, the ESOP has not. How committee members were selected under the ESOP has not been made part of the record.

In the spring of 2011, there were three committee members (who also were trustees): Plaintiff Brian Sexton, Robert Karsten, and Eric Smith (Defendants'

4

chief executive officer). *Id.* at Pg ID 98. Defendants' board of directors was made up of four inside directors and three outside directors. (See, Pl. Dep. p53-54 RE#9-2, Pg ID 7). The insiders were Plaintiff, Eric Smith, Tom Karsten, and Alan Kelsey (Defendants' chief operating officer). *Id.* The outsiders were George LaFleche, Mike Kelly, and Robert Karsten. *Id.*

Two director seats were up for election at the 2011 shareholders meeting — the seats held by Messrs. LaFleche and Kelsey. (See, Sexton letter, RE#9-8. Pg ID 112)

About this time, Plaintiff recalls, he learned that a "grass roots voting campaign" was underway to have two of Defendants' employees, Jim Skiba and Robert Fitch, elected to the board as write-in candidates. (Pl. Dep. p71-72 RE#9-2, Pg ID 75). He was asked:

> Q: When did you learn that Jim Skiba and Bob Fitch were going to mount a campaign to get on the board?
>
> A: I don't know that I ever learned that they mounted a campaign. They — at some point in February or March 2011, I was told that they were —they were interested in being on the board by then.
>
> Q: When did you find — okay. And what did you — who did you find that out from?

5

A: I found that out from an individual in the Coldwater plant that I believe was actually organizing the grass roots voting campaign.

Q: And who was that?

A: Ryan Craig. . . .

Q: Did you know that the write-ins were going to be Skiba and Fitch?

A: Yes, I knew that. Mr. Skiba and Mr. Fitch both contacted me separately and told me that they were aware that there was a write in, there would be a write-in campaign, and that the two of them individually had told me that they were okay with being on that list.

*Id*.

Shortly before the election, the board of directors held a meeting. (Pl. Dep. p91-92 RE#9-2, Pg. ID 79); see Defs.' Mot. Ex. 10 (attaching meeting minutes). The meeting was held on April 29, 2011. (Def Minutes RE#9-11, Pg ID 123). All seven directors were present. *Id*. By a vote of 4-3, the minutes recount, Plaintiff was voted out as trustee:

"Mr. Smith discussed recent attempts by Brian Sexton and Robert Karsten to seat two employees as Directors of the Company. They were informed that the By-laws of the Corporation provide that directors are elected at the annual meeting of shareholders, which is upcoming.  Further, the By-laws required at least 3 non-employee directors and their proposed directors would violate this. They could not

6

elect the Directors by less than all of the Trustees consenting. They also could not elect only some and not all of the open Director slots. Finally, their attempt to hold a premature shareholders meeting lacked proper notice.

Mr. Smith recommended that Robert Karsten and Brian Sexton be removed from the ESOP Administration Committee and terminated as ESOP Trustees. Mr. Kelly made that motion, seconded by Al Kelsey. Motion carried 4 to 3 with Bob Karsten, Brian Sexton and Tom Karsten voting against.

A short time later (the parties do not specify precisely when), the election was held. (See, e.g., Pl. Dep. p.92, RE#9-2, Pg ID 79) (recalling that the shareholders meeting followed the board of directors meeting). From the votes submitted by the employees to the trustee on the "trustee direction form," Messrs. LaFleche and Kelsey each received about 150,000 votes. Messrs. Fitch and Skiba, the employees' write-in candidates, each received more than 200,000 votes.

The board of directors meeting was held on Friday, April 29. The following Monday, Plaintiff emailed Mr. Smith threatening to report the board's actions to state and federal authorities "unless they are immediately remedied." (Sexton e-mail, RE#9-13, Pg ID 133). In full, Plaintiff's email provided:

> I believe that your actions on Friday in refusing to seat
> Bob Fitch and Jim Skiba as directors of the company and

7

> removing Rob Karsten and me as Trustees of the ESOP
> are violations of ERISA and the Michigan Corporations
> Business Act and other state and federal laws. I plan to
> bring these violations to the U.S. Department of Labor
> and Michigan Department of Licensing and Regulatory
> affairs unless they are immediately remedied.

*Id*. Defendants did not respond to Plaintiff's email, much less "remedy" their

actions. Plaintiff, however, did not bring his complaints to the authorities. (Pl. Dep.

p. 99-102 RE#9-2, Pg ID 80-81). In his deposition, Plaintiff was asked:

> Q: Did you go to the U.S. Department of Labor?
>
> A: No, I did not. I spoke with our attorney, Mr. Kanan, at
> that time. And actually, I spoke with several other
> lawyers about it at the time, and they basically said that
> this type of lawsuit would be something that I would
> have to file on my own. . . .
>
> Q: Did you go to the Michigan Department of Licensing
> and Regulatory Affairs?
>
> A: I did not directly, no. . . .
>
> Q: Did you go to the Michigan Department of Labor?
>
> A: No, I did not. After sending [the email], I met with
> actually several different attorneys to discuss my options.
> Well, I met with attorneys. Mr. Fitch, Mr. Skiba, met
> with attorneys. We had conversations with attorneys and
> conference calls, basically talking about what can we do
> to reverse this process.
>
> Q: I'm not going to ask you what they said. . . .
>
> A: You're not going to ask me, but I'm going to tell you
> what the attorneys told me. They — the attorneys I spoke
> with — and I spoke with five different attorneys at

Troy_722694_1

different times about what had gone on here. All five of those attorneys agreed that this was an illegal action and that we did have cause to file a lawsuit. Unfortunately, I was told that all of those lawsuits have to be funded by the people who file the suits, and they are very expensive. . . .

Q: Okay. So basically you told — you sent the email to [Mr. Smith] saying, "I'm going to — if these actions are not immediately remedied, I'm going to contact the federal government and the state," and that was the extent of what you — talking to attorneys, talking to Zaborney; that's the extent of what you did?

A: Yeah, I planned to bring these violations to the attention of the U.S. Department of Labor and the Michigan Department of Licensing and Regulatory Affairs.

Q: So you made — you had the threat, you talked to attorneys, you talked to Zaborney, and basically that's what — everything you did?

A: That's correct.

Q: Okay.

A: So far.

*Id.* As noted, Plaintiff emailed Mr. Smith on May 2, 2011. About six months passed.

On October 30, 2011, Defendants terminated Plaintiff's employment. (Pl. Dep. p. 231 RE# 9-2, Pg. ID 83). This litigation ensued.

9

## SUMMARY OF THE ARGUMENT

This is a case of first impression concerning the interpretation and application of the "inquiry" requirement in Section 510, 29 USC 1140, ERISA's anti-retaliation provision.  Section 510 provides in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person **because he has given information or has testified or is about to testify in any inquiry…**relating to this chapter or the Welfare and Pension Plan's Disclosure Act.

29 U.S.C. 1140 (Emphasis added).

Sexton claims his May 2 email was the reason for his termination on October 30, almost six months after he sent it, and that his termination violated Section 510.  The District Court dismissed the retaliation claim, "Because this email neither refers to questions asked of Plaintiff nor to questions asked by Plaintiff…."  Sexton, 912 F. Supp. 2d at 474(RE#16, Pg. ID 223).

Following Sixth Circuit precedent to look for the "ordinary meaning of statutory words, the District Court concluded that, "The ordinary meaning of an "inquiry" is thus asking for information — not offering it.  By its plain terms, § 510 does not apply to unsolicited information given by an employee. While the

section does not require a dialog, it does not cover an isolated accusation unconnected to any request for information." *Sexton*, 912 F. Supp. 2d at 468(RE#16, Pg. ID 213).   The District Court concluded that no "inquiry" occurred and the May 2 email did not trigger Section 510, "Because this email neither refers to questions asked of Plaintiff nor to questions asked by Plaintiff, Defendant is entitled to summary judgment on Plaintiff's whistleblower claim." *Sexton*, 912 Scup. 2d at 474 (RE#16, Pg. ID 223).

1.    The District Court relied on the Seventh Circuit decision in *George v. Junior Achievement of Cent. Ind., Inc.*, 694 F.3d 812, 815 (7th Cir. 2012) which interpreted Section 510.  In *George*, the Seventh Circuit determined, "that an employee's grievance is within § 510's scope whether or not the employer solicited information…Someone must ask a question, and the adverse action must be caused by the question or the response." *George*, 694 F.3d at 817.  "[The] conversations involved **an "inquiry,"** as we understand that word, **because [the employer] responded** to them rather than ignoring them. **(If it had ignored them, they could not have caused the discharge.**)" *George*, 694 F.3d at 817 (Emphasis added).  Panel never responded to Sexton's May 2 email.

2.    *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 222-24 (3d Cir. 2010); *Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325, 330 (2d Cir. 2005) (per

11

Troy_722694_1

curiam); *King v. Marriott Int'l, Inc.*, 337 F.3d 421, 427-28 (4th Cir. 2003) each

interpreted "inquiry" to require a request for information. In the instant case, there

was no required request for information by Sexton or Panel, necessary to trigger

Section 510 and Sexton's retaliation complaint cannot stand.

3.    *Hashimoto v. Bank of Hawaii*, 999 F.2d 408 (9th Cir.1993) and

*Anderson v. Electronic Data Systems Corp.*, 11 F.3d 1311 (5th Cir.1994) were

fully considered by the District Court and do not support or require reversal.

Neither *Hashimoto* nor *Anderson* examined the statutory language of Section 510

in detail. The Ninth Circuit appeared to focus its analysis on the adoption of a

"fair" interpretation while the Fifth Circuit, in adopting *Hashimoto*, gave the issue

cursory treatment. In addition, no subsequent court has followed *Hashimoto* or

*Anderson.*

4.    Section 510 should not be expanded to include protection for Sexton's

email issued outside of an "inquiry" because that would require impermissibly

adding to the statute as enacted by Congress. Other statutory schemes (the Civil

Rights Act) and decisions (*Kasten v. Saint Gobain Performance Plastics Corp.*,

131 S.Ct. 1325 (2011) and *NLRB v. Scriviner,* 405 U.S. 117, 92 S.Ct. 798 (1972))

interpreting different anti-retaliatory provisions are not relevant because they

concern words unrelated to Section 510. "[T]here is no rule that all statutes

Troy_722694_1

addressing related topics mean the same thing – let alone that all statutes should receive the reading most favorable to whistleblowers." *Hill v. Mr. Money Finance Co.*, 309 Fed.Appx. 950, 961 (6th Cir. 2009).

5.     The Secretary is not entitled to deference on his interpretation of Section 510.  Deference to the Secretary must be rejected because Congress has not delegated administrative authority to him.  "Congress has expressly established the Judiciary and not the Department of Labor as the adjudicator or private rights of action under the statute." *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 649, 110 S.Ct. 1384 (1990).

### Argument

This case concerns the interpretation and application of Section 510, ERISA's anti-retaliation provision.  Section 510 provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person **because he has given information or has testified or is about to testify in any inquiry or proceeding** relating to this chapter or the Welfare and Pension Plan's Disclosure Act.

29 U.S.C. § 1140 (Emphasis added).

13

The question framed by the District Court is, "[W]hether § 510 extends its protections to an employee's unsolicited, internal complaint to his employer that it has violated ERISA." *Sexton*, 912 F. Supp. 2d at 459(RE#16, Pg. ID 198).

The central fact in the instant case is simple and undisputed. Sexton sent Panel an unsolicited e-mail:

> I believe that your actions on Friday in refusing to seat
> Bob Fitch and Jim Skiba as directors of the company and
> removing Rob Karsten and me as Trustees of the ESOP
> are violations of ERISA and the Michigan Business
> Corporations Act and other state and federal laws, I plan
> to bring these violations to the attention of the U.S.
> Department of Labor and Michigan Department of
> Licensing and Regulatory Affairs unless they are
> immediately remedied.

(Sexton email, RE# 9-13, Pg. ID 133).

He claims his May 2 email was the reason for his termination almost six months later, on October 30. The District Court dismissed the retaliation claim, "Because this email neither refers to questions asked of Plaintiff nor to questions asked by Plaintiff...." *Sexton*, 912 F. Supp. 2d at 474(RE#16, Pg. ID 223).

This case centers on the word "inquiry" in Section 510"[2] which is not defined by ERISA. Although the interpretation of "inquiry" under Section 510

---

2       There has been no claim that Sexton gave information in a "proceeding." According to the District Court, "Webster's defines 'proceedings' as 'the course of

Troy_722694_1

raises a question of first impression in this Circuit, this issue has been the subject

of intense examination by the appellate courts in the Seventh, Second, Third, and

Fourth Circuits, all of which were considered by the District Court. *Edwards v.*

*A.H. Cornell & Son, Inc.*, 610 F.3d 217, 222-24 (3d Cir. 2010); *Nicolaou v.*

*Horizon Media, Inc.*, 402 F.3d 325, 330 (2d Cir. 2005) (per curiam); *King v.*

*Marriott Int'l, Inc.*, 337 F.3d 421, 427-28 (4th Cir. 2003); *George v. Junior*

*Achievement of Cent. Ind., Inc.*, 694 F.3d 812, 815 (7th Cir. 2012).

"[T]he starting point must be the language employed by Congress." *Reiter*

*v. Sonotone Corp.*, 442 U.S. 330, 337 (1979).  This Court recently instructed that

the proper interpretation of an undefined term here "inquiry," is left to the common

definition of that term its "ordinary and natural meaning." *Entertainment*

*Products, Inc. v. Shelby County, Tenn.*, 588 F.3d 372, 381 fn3 (6th Cir.

2009)(citation omitted); *United States v. Lumbard*, 706 F.3d 716, 723 (6th Cir.

procedure in a judicial action or in a suit in litigation.' **Webster's Third New International Dictionary** 1807 (unabridged ed. 2002). Similarly, **Black's** defines "proceeding" as '[t]he regular and orderly progression of a lawsuit,' '[a]ny procedural means for seeking redress from a tribunal or agency,' or '[t]he business conducted by a court or other official body.' **Black's Law Dictionary** 1241 (8th ed. 2004).  In this case, Plaintiff had not initiated litigation at the time of his email. No judicial proceeding was pending. His information was not given in a 'proceeding.'" *Sexton*, 912 F.Supp. 2d at 468 (Re 16, Pg ID 213).

15

Troy_722694_1

2013) quoting *In re Carter*, 553 F.3d 979, 986 (6th Cir.2009).3  When interpreting

and applying statutes:

> It is elementary that the meaning of a statute must, in the
> first instance, be sought in the language in which the act
> is framed, and if that is plain, and if the law is within the
> constitutional authority of the lawmaking body which
> passed it, **the sole function of the courts is to enforce it
> according to its terms.**

*Peabody Coal Co. v. Dir., Office of Workers' Comp. Programs*, 718 F 3d 590,

593 (6th Cir. 2013)4 quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37

S.Ct. 192 (1917) (Emphasis added).


"'[W]hen the statutory language is plain, [the court] must enforce it

according to its terms.'"  *County of Oakland v. Federal Housing Finance

Agency*, 716 F.3d 935, 939 (6th Cir. 2013) (citation omitted).   This Court,

"'[O]rdinarily resist[s] reading words or elements into a statute that do not appear

on its face.'  In fact, courts have a duty to refrain from reading a phrase into a

statute when Congress has left it out.  'It is not the Court's role to address

perceived inadequacies in [a statute].'"  *Hoge v. Honda of America Mfg., Inc.*,

---

3      The DOL's reliance on *Casias v. Wal–Mart Stores, Inc.*, 695 F.3d 428, 635
(6th Cir. 2012) is misplaced.  *Casias*, interpreting a Michigan statue, relied on
Michigan law (*People v. Lee*, 447 Mich. 552 (Mich. 1994)), not federal law to
determine the scope of reliance on dictionary definitions.  *Casias, 695 F.3d* at 435.

4      Curiously, Sexton has not even cited one Sixth Circuit decision in his entire
brief.

Troy_722694_1

384 F.3d 238, 246-247 (6th Cir., 2004) (Citations omitted). The District Court

followed these instructions.

Thus, the District Court correctly started its analysis with the word,

"inquiry," itself.  Accordingly, the District Court sought the "ordinary and natural"

meaning of "inquiry":

> **Webster's** defines "inquiry" as "the act or an instance of
> seeking truth, information, or knowledge about
> something," or "the act or an instance of asking for
> information." **Webster's Third New International
> Dictionary** 1167 (unabridged ed. 2002). **Black's**
> likewise defines "inquiry" as "[a] request for
> information." **Black's Law Dictionary** 808 (8th ed.
> 2004).
>
> **The ordinary meaning of an "inquiry" is thus asking
> for information — not offering it.**  By its plain terms, §
> 510 does not apply to unsolicited information given by an
> employee. **While the section does not require a dialog,
> it does not cover an isolated accusation unconnected
> to any request for information.**

*Sexton*, 912 F.Supp. 2d at 468(RE#16, Pg. ID 213)(Footnote omitted).

17

This definition of "inquiry" is consistent with the Merriam-Webster definition, "a request for information" (http://www.merriam-webster.com/dictionary/inquiry)[5] and has not been challenged by Sexton or the Secretary.

Once the definition of "inquiry" in Section 510 was established, the next step for the District Court was to determine if Section 510 protection was triggered by an "inquiry." For this, the District Court relied on the Seventh Circuit's *George* decision, decided only a month earlier:

> Making a subtle but significant observation, Judge Easterbrook noted: "The statute does not specify who asks the question or, more generally, initiates the inquiry. There is no linguistic reason why 'inquiry' cannot refer to the employee's questions as well as the employer's." *George*, 694 F.3d at 815. Accordingly, Judge Easterbrook rejected the employer's argument that "inquiry" "must apply to questions asked of the employee but not questions asked by an employee," concluding: "Because § 510 refers to inquiries without specifying who is doing the inquiring, it logically covers employees' inquiries." *Id.*
>
> The opinion's observation that an "inquiry" can be initiated by either the employee or the employer is the only reasonable interpretation of § 510 that does not require reading limitations into the statute. That is, as drafted, the section prohibits retaliation against an

---

5    For the purpose of this provision, the apt informal usage of "inquiry" might be "[t]he action of asking or questioning." 7 **The Oxford English Dictionary** 1010 (2d ed.1989). *George,* 694 F.3d at 816.

> employee who "has given information . . . in any inquiry
> or proceeding." 29 U.S.C. § 1140.  An interpretation
> contrary to Judge Easterbrook's would require adding
> "initiated by an employer" to the text of § 510 — that the
> section prohibits retaliation against an employee who
> "has given information...in any inquiry or proceeding
> [initiated by an employer]." This is not the statute that
> Congress promulgated.

*Sexton*, 912 F.Supp. 2d at 473-474(RE#16, Pg ID 222).

Thus, the District Court agreed with the Seventh Circuit and determined that an

inquiry could be initiated by an employee as well as the employer.  Neither Sexton

nor the Secretary challenged this determination.

The District Court, however, was concerned that the Section 510's "inquiry"

requirement could be ignored.  It explained the proper application of Section 510's

"inquiry" trigger to the instant case by contrasting the facts of the instant case with

*George*:

> A fuller explanation is that "an employee's grievance is
> within § 510's scope whether or not the employer
> solicited information," provided that the employee
> himself solicited information. **Without the asking for
> information, there is no "inquiry."**
>
> In this case, unlike in *George*, **Plaintiff did not ask for
> any information**. To reiterate, in full Plaintiff's email
> provided:
>
>> I believe that your actions on Friday in refusing to
>> seat Bob Fitch and Jim Skiba as directors of the

19

company and removing Rob Karsten and me as
Trustees of the ESOP are violations of ERISA and
the Michigan Corporations Business Act and other
state and federal laws. I plan to bring these
violations to the U.S. Department of Labor and
Michigan Department of Licensing and Regulatory
affairs unless they are immediately remedied.

Defs.' Mot. Ex. 12. **Because this email neither refers to
questions asked of Plaintiff nor to questions asked by
Plaintiff, Defendant is entitled to summary judgment
on Plaintiff's whistleblower claim.**

*Sexton*, 912 F.Supp. 2d at 474(Re 16, Pg. ID 223)(Emphasis added)

The instant District Court decision must be affirmed.  It is text based – based
on the "ordinary and natural" definition of "inquiry," the key word in Section 510.
No one, neither Sexton nor Panel, asked for information.  This in uncontroverted.
It is also well-reasoned and consistent with existing law.  The District Court
examined every relevant Section 510 decision, considered the "ordinary and
natural" definition of "inquiry," which has been adopted by other courts, and
followed well-reasoned precedent, the Seventh Circuit's *George* decision, a
decision ignored by Sexton, but praised by the Secretary.  (DOL Br. at 27-28 Re
115, Pg ID 36-37).  Section 510, as written by Congress, was followed.

20

Sexton's challenge is unclear.  In the instant appeal, Sexton has not articulated his challenges to the District Court's Sexton decision[6] and we are left to guess at the issues.

### 1.  The District Court Decision Is Consistent With *George*

With compelling decisions from the Second, Third, Fourth, and Seventh Circuits, the District Court chose to follow *George* from the Seventh Circuit and the most recent decision on Section 510.  In *George*, an employee discovered that money withheld from his pay was not deposited into his retirement account and health savings account.  He lodged complaints with employer accountants and executives, "ask[ing] (repeatedly) what would be done to remedy the situation." *George*, 694 F.3d at 817.  He finally received a response; checks to make up for the missed deposits plus interest.  The employee was terminated several months later after a dispute arising from his drawing down of his deferred compensation account.

Drawing from precedent, including Supreme Court decisions, the Seventh Circuit concluded that, "Because § 510 refers to inquiries without specifying who

---

6    Sexton's Brief filed with this Court in support of the instant appeal bears an uncanny resemblance to the Secretary's brief filed with the Seventh Circuit in *George*.  Because there is no reference whatsoever in the Argument section to the instant District Court decision, its alleged defects, or the record, Sexton's brief is not in conformity with FRCP 28(a)(9).

Troy_722694_1

is doing the inquiring, it logically covers employees' inquiries…. *George*, 694

F.3d at 815.  The Court further explained:

> [T]he "in" tells us that **the information has to be part of, rather than extraneous to, the inquiry** or proceeding.  It supplies a location, a "where." Giving information in a question means that the information is imparted in the form of a question; that is a how rather than a where.
>
>        *           *           *
>
> We conclude that **the best reading of § 510 is one that divides the world into the informal sphere of giving information in or in response to inquiries** and the formal sphere of testifying in proceedings. This means that an employee's grievance is within § 510's scope whether or not the employer solicited information…**Someone must ask a question, and the adverse action must be caused by the question or the response.** ***

*George*, 694 F.3d at 817.

The Seventh Circuit concluded by applying its legal analysis to the facts,

"[The employee] notified [the employer] of the potential breach of its fiduciary

duties and asked (repeatedly) what would be done to remedy the situation."

*George,* 694 F.3d at 817.  The Court's conclusion is dramatic:

> Those conversations involved **an "inquiry,"** as we understand that word, **because [the employer] responded** to them rather than ignoring them. **(If it had ignored them, they could not have caused the discharge.)**

22

*George*, 694 F.3d at 817 (Emphasis added).

This conclusion bears repeating, "If [the employer] had ignored them [questions] they could not have caused the discharge." [7]

That is the exact case here. *George* confirms that there was no "inquiry." Sexton's email was not, by itself, an inquiry under Section 510. No question was asked. No response was given. And, by ignoring the email, Panel did not participate in an inquiry. There was no response and no inquiry. Paraphrasing *George*, since Panel ignored the email, it could not have caused the discharge.

### 2. *Nicolaou, Edwards*, And *King* Require Denial Of The Appeal

Even though the District Court chose to follow the Seventh Circuit's *George* decision, it could have dismissed Sexton's Section 510 claim based on the well-reasoned decisions in *Nicolaou, Edwards* and *King* from the Second, Third, and Fourth Circuits which provide an alternative reason for affirming the District Court's dismissal of the instant case: that Section 510 does not protect Sexton who provides unsolicited information.

---

[7]    Obviously, and in response to the Secretary (DOL Br. p. 20 Re 115, Pg. ID 29), more than a question mark at the end of a sentence is needed to create an inquiry.

Troy_722694_1

The Second Circuit concluded that Section 510 does not apply to unsolicited complaints by employees. *Nicolaou,* 402 F.3d at 330.  An employee discovered that her employer was underfunding the company's 401(k) plan and brought her concern to the company's chief financial officer "who advised her to let the matter drop." *Id.* at 326.  She then went to the company's controller, "who declined to address it" and to an attorney for the company. *Id*. The attorney, who "expressed enormous concern" about the matter undertook an internal investigation which confirmed the employee's findings."  Within days after a meeting with the president and attorney, the employee was demoted and was subsequently terminated. *Id.* at 326-27.

Dismissal of the subsequent Section 510 lawsuit was appealed to the Second Circuit.  Starting with the ordinary meanings of "inquiry" and "proceeding, the Court, "[P]resume[s] that Congress intends that its statutory text be read in accordance with its plain meaning," and noted:

> While "proceeding" refers to the progression of a lawsuit or other business before a court, agency, or other official body, "inquiry" refers broadly to any request for information. The informal gathering of information thus falls within the plain meaning of "inquiry," and we need go no further to conclude that it is protected by Section 510.

24

*Id.* (Quotation marks and citations omitted) (citing **Black's Law Dictionary** 808, 1241 (8th ed. 2004); **Webster's Third New International Dictionary** 1167, 1807 (1993)).

Applying these definitions to the facts of the case, the Second Circuit determined that the employee had alleged sufficient facts to suggest that she had given information in an "inquiry" because:

> [I]f Nicolaou can demonstrate that **she was contacted to meet with [the president] in order to give information** about the alleged underfunding of the Plan, her actions would fall within the protection of Section 510…**The meeting with [the president] was something less than a formal proceeding, but we believe it was sufficient to constitute an "inquiry"** within the meaning of Section 510."

*Nicolaou,* 402 F.3d at 329-30 (Citation omitted, emphasis added)

The Second Circuit did agree that Section 510 "does require an inquiry — that is, that information not merely given, but also asked for.  Unsolicited information volunteered by an employee, the court thus implicitly suggested, would be insufficient to state a claim under § 510." *Sexton,* 912 F.Supp 2d at 460(RE#16, Pg. ID 219)..

In *Edwards,* the Third Circuit also concluded that Section 510 does not protect unsolicited complaints by employees.  An employee reported suspected ERISA violations to company management and alleged that the company responded by terminating her employment. *Edwards,* 610 F.3d at 219.  She

25

brought suit asserting an anti-retaliation claim under Section 510 and the employer responded that the employee had not engaged in a protected activity under Section 510.  The district court dismissed the retaliation claim and the employee appealed. As in the instant case, the Secretary of Labor filed an amicus brief supporting the employee's position, arguing, "Broadly but naturally construed…any inquiry or proceeding' encompasses plan participants' complaints to management or plan officials about wrongdoing, and the process by which that information is considered, however informal." *Edwards*, 610 F.3d at 222-23.

To analyze the appeal, the Third Circuit started with the key textual parts of Section 510, "inquiry" and "proceeding."  Similar to the instant District Court and Seventh Circuit, the *Edwards* Court concluded:

> **An "inquiry" is generally defined as "[a] request for information."** Here, Edwards does not allege that anyone approached her requesting information regarding a potential ERISA violation. Rather, she made her complaint voluntarily, of her own accord. Under these circumstances, the information that Edwards relayed to management was not part of an inquiry under the term's plain meaning….

> Neither is Edwards's conduct encompassed by the term "proceeding." A "proceeding" is commonly defined as "[t]he regular and orderly progression of a lawsuit" or the "procedural means for seeking redress from a tribunal or agency." Here, there is no suggestion that any such formal action has occurred.

26

*Edwards*, 610 F.3d at 223 (Citations omitted, emphasis added)(quoting **Black's Law Dictionary** 864, 1324 (9th ed. 2009).

*King*, the Fourth Circuit decision, interpreted Section 510 to require a more formal approach, requiring more than unsolicited complaints. An employee repeatedly complained about the company's vice president transferring millions of dollars from the medical plan to the corporate reserve account. *King*, 337 F.3d at 423 Complaints were made to some co-workers, her supervisor, and a company attorney. *King*, 337 F.3d at 428. After the employee was discharged, she filed an ERISA anti-retaliation claim. The district court granted the employer summary judgment.

Concentrating its attention on the text of the statute, the Fourth Circuit affirmed, explaining:

> In the instant case, as well, the use of the phrase "testified or is about to testify" does suggest that the phrase "inquiries or proceedings" referenced in section 510 is limited to the legal or administrative, or at least to something more formal than written or oral complaints made to a supervisor. The phrase "given information" does no more than insure that even the provision of non-testimonial information (such as incriminating documents) in an inquiry or proceeding would be covered.

*Id*. (Citations, quotation marks, and internal alterations omitted) (quoting **Ball v. Memphis Bar-B-Q Co**., 228 F.3d 360, 364 (4th Cir. 2000)).

Troy_722694_1

"Nowhere in the complaint does there appear any allegation that King had testified in any proceeding (legal, administrative, or otherwise), or that she was about to testify. Nor is there any allegation that she had given information in such a proceeding." *King,* 337 F.3d at 427-428.  The Fourth Circuit expressly rejected requests for an interpretation protecting intra-office complaints and protests outside of the Section 510 statutory language:

> We simply do not agree that the language of section 510 can be "fairly construed" to extend to such a circumstance. Nor do we think that we would be free to reject the most compelling interpretation of the statutory language for a "fair" interpretation, even if we preferred as a matter of policy the result yielded by the broader interpretation.

*King,* 337 F.3d at 428 (Citations and brackets omitted).

There was no Section 510 retaliation.

*Nicolaou, Edwards,* and  *King*, have a commonality applicable here.  As with the dictionary definitions, each interpreted "inquiry" to require a request for information.  In the instant case, there was no required request for information by Sexton or Panel, necessary to trigger Section 510.  Sexton's retaliation complaint cannot stand.

28

Troy_722694_1

### 3. *Hashimoto* and *Anderson* Should Not be Followed

Sexton complains that the District Court did not follow the decisions in

*Hashimoto v. Bank of Hawaii*, 999 F.2d 408 (9th Cir.1993) and *Anderson v.*

*Electronic Data Systems Corp.*, 11 F.3d 1311 (5th Cir.1994). These decisions

were fully considered by the District Court and do not support or require reversal

of the District Court.

In *Hashimoto,* an employee alleged she was terminated after she

"complained [to supervisors] about 'potential and/or actual violations by the Bank

of the reporting and disclosure requirements and fiduciary standards of ERISA.'"

*Hashimoto*, 999 F.2d at 409. She complained she had been directed to reimburse a

former employee from a profit-sharing plan for taxes that had been withheld from a

lump sum distribution and ad been instructed to recalculate a former employee's

pension plan benefit using final pay, not final average pay in violation of ERISA

regulations.

The Ninth Circuit, without any in depth evaluation of Section 510's text,

merely concluded that the employee's unsolicited reporting of information of

misconduct was sufficient to state a claim for retaliation. The definition of

inquiry," a requirement of Section 510, was not considered or analyzed. Instead of

Troy_722694_1

Section 510's text, *Hashimoto* relied on what could be "fairly construed…."
*Hashimoto,* 999 F.2d at 411.

Likewise, in *Anderson,* the employee alleged that he was discharged after reporting a request that he perform illegal acts and other improper conduct to management. The Fifth Circuit, citing *Hashimoto,* only repeated the wording of Section 510 without even addressing the "inquiry" issue.

Both *Hashimoto* and *Anderson* have been rejected by every subsequent appellate court reviewing Section 510 (*George, Nicolaou, Edwards,* and *King*) because of their attempt to create an overbroad, non-textual gloss on Section 510. This Court must also reject *Hashimoto* and *Anderson.*

First, neither *Hashimoto* nor *Anderson* examined the statutory language of Section 510 in detail. The Ninth Circuit appeared to focus its analysis on the adoption of a "fair" interpretation while the Fifth Circuit, in adopting *Hashimoto,* gave the issue cursory treatment.

Second, the "enticing" concept that an anti-retaliation provision should be liberally construed has limits. "Although ERISA should be liberally construed in favor of protecting the participants in employee benefit plans, **this does not entitle [the court] to ignore clear statutory language**." *Sexton,* 912 F.Supp.2d at 473

30

(RE#16, Pg. ID 221) (Citation and quotation marks omitted) (Emphasis added). *George, Nicolaou, Edwards,* and *King* confirm that any valid interpretation of Section 510 must be based on its text.

In fact, the District Court did give Section 510 a liberal construction. The District Court adopted *George's* liberal interpretation of "inquiry" to include questions asked by an employee as well as the employer. Even with a liberal interpretation of "inquiry," Section 510 still only protects an "inquiry," an "asking for information…." *Sexton*, at 912 F.Supp.2d at 474 (RE#16, Pg. ID 223). And, in any way the instant case is examined, there was no "inquiry" - no request for information. Sexton never asked for information. He only sent the email making the threat. Panel never asked for any information from Sexton. It is uncontroverted that Panel was silent. While Sexton's claim may have some emotional ring, neither he nor Panel made an "inquiry" triggering Section 510.

Sexton and the Secretary ask the Court to ignore the infirmities of *Hashimoto* and *Anderson* and limitations in the text of Section 510 and find a retaliation claim. This the Court should not do. Their sometimes overlapping arguments must be rejected.

Troy_722694_1

### 4. Section 510 Should Not Be Expanded To Include Protection For Sexton's Email Issued Outside Of An "Inquiry"

Faced with the "inquiry" requirement, the Secretary argues that the statutory language is ambiguous and should be expanded to include protection for Sexton's email. The Secretary would dispense with the "inquiry" requirement by interpreting it out of existence. This argument by the Secretary has many flaws. The Court must reject this attempt to negate Section 510's "inquiry" requirement.

At the threshold, both Sexton and the Secretary have accepted the definition of "inquiry." They each concede that an "inquiry" is defined as a "request for information" (Sexton Br. p. 8, Re 061, Pg. ID 16) or "'[t]he action of asking or questioning...'" (DOL Br. p. 12 Re 115, Pg. ID 21). The other courts which examined "inquiry" do not differ. As previously pointed out, *George,* 694 F.3d at 817, discussed the triggering of an inquiry as "'[S]omeone must ask a question, and the adverse action must be caused by the question or the response." *Edwards,* 610 F.3d at 223 concluded that, "An 'inquiry' is generally defined as '[a] request for information.'"

Blocked by the common definition of "inquiry" requiring a request for information, the Secretary asks this Court to leap from the common definition of the term "inquiry" to the proposition that this Court should look outside the common definition of "inquiry," citing *Casias v. Wal-Mart Stores, Inc.,* 609 F.3d

32

428, 435 (6th Cir. 2012). *Casias* does not aid the Secretary. That case analyzed how Michigan state courts interpret their own statutes. *Id.*, at 435-436. While *Casias* is close to Sixth Circuit precedent, Michigan's analysis of its own statutes takes a more expansive view than one taken by this Court. As stated at 15-16, infra, this Court has instructed that the proper interpretation of an undefined term is left to the common definition of that term.

Citing *George*, the Secretary also tries to manufacture an ambiguity over "inquiry" which does not exist here. Despite all of the parties' agreement to the definition of "inquiry," the Secretary tries to argue that the language is ambiguous because of a split among the circuits exists as to whether Section 510 protects solicited and unsolicited employee complaints. The *George* Court, however, found an ambiguity in whether Section 510 only applied to employer inquiries, or also equally applied to employee inquires. That ambiguity, if it existed, was resolved when the Seventh Circuit concluded that "inquiry" applied to both employer and employee inquiries, an interpretation adopted by the District Court. *Sexton*, 912 F.Supp. 2d at 473-474(RE#16, Pg. ID 222-223).

The plain meaning of "inquiry" is the act of seeking information. Sexton did not seek information. And under the plain meaning of the Section 510, Sexton's conduct was not protected. *Peabody*, 718 F3d at 594 ("When we can discern an

33

unambiguous and plain meaning from the language of a statute, our task is at an end.")

### 5. Because Section 510's Definition of 'Inquiry' Means The Act Of Seeking Information, The Court Should Not Give A Broader Interpretation Of Inquiry To Include All Statements or Complaints Made By Employees

It bears repeating, the plain meaning of Section 510 protects employees that either give information in an inquiry or a proceeding. The Secretary concedes that an inquiry involves "seeking information," but argues that the "giving of information" should expand to include statements or complaints made outside of an inquiry. This position runs counter to the plain language of the statutory text as it ignores the term "inquiry". Section 510 provides protection for employees who give or request information or "testify" in either an "inquiry" or a "proceeding." Reading the statutory text, employees that "give information" must do so in either an "inquiry" or a "proceeding. It is not sufficient to merely "give information." Information must be given in either an inquiry or a proceeding relating to ERISA. 29 U.S.C. Section 1140.

Section 510 cannot be expanded to include all complaints or statements made by employees. If it did, as suggested by the Secretary, the term "inquiry" would be unnecessary and employees would only need to "give information" regarding ERISA to trigger the Section 510's protections. The Court cannot ignore

34

a term in a statute.   Indeed, all of the words in the statute must be given effect, including the term "inquiry." *In Re Central States Freight Corp.,* 45 F.2d 73 (6th Cir. 1930).  To expand the definition of inquiry beyond the common definition would intrude on the "province of Congress," a practice this Court avoids. *Peabody* , 718 F.3d at 594.

To support their effort to expand the definition of "inquiry," Sexton and the Secretary cite to numerous cases that discuss other retaliation statutes for the proposition that this Court should give broad interpretation to Section 510.  Section 510 and its "inquiry" requirement, however, is not susceptible to the expansive interpretation that it should include all manner of employee statements or complaints made regarding ERISA.  Moreover, just because expanding the definition of inquiry, beyond the plain language of the statute would benefit Sexton does not constitute a legitimate reason to do so. *Peabody,* 718 F.3d at 593. Indeed, the term "inquiry" does not protect Sexton's email and the statutory language "[i]s susceptible to no other understanding." *Id.*

**A.    Congress Narrowed The Focus of Section 510 Protections**

There is no question that, "In order to protect pension plan participants and beneficiaries, Congress set up a comprehensive statutory scheme which established "standards of conduct, responsibility, and obligation for fiduciaries." *Authier v.*

35

Troy_722694_1

*Ginsberg,* 757 F.2d 796, 799 (6th Cir. 1985)(Citation omitted). The statutory

scheme of ERISA is comprehensive and contains safeguards to secure employee

pension rights. *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 137, 111 S.Ct.

478 (1990). But, *Authier* and *Ingersoll-Rand* are preemption cases. Congress

created ERISA's retaliation provision with a limited scope. Even the Supreme

Court recognized that protecting plan participants and their pensions, "[i]s

prototypical of the kind Congress intended to cover under Section 510." *Ingersoll-*

*Rand,* 498 U.S. at 143.

Similarly, *Inter-Modal Rail Employees Ass'n. v. Atchison, Topeka &*

*Santa Fe Ry. Co.,* 520 U.S. 510 (1997), reviewed ERISA's protection against

interfering with rights to welfare plans. With regard to Section 510, the Court

stated that "Section 510 counterbalances this flexibility by ensuring that employers

do not 'circumvent the provision of promised benefits." *Inter-Modal,* 520 U.S. at

515 (citation omitted). "Section 510 helps to make promises [of benefits]

credible." *Inter-Modal,* 520 U.S. at 516. Indeed, the intended scope of Section

510 is narrowly tailored and intended for the protection of employee rights in their

benefit plans. *Ingersoll-Rand,* 498 U.S., at 137.

36

**B.    Anti-Retaliation Provisions From Other Statutes Are Not Relevant To Show Expanded Section 510 Coverage**

Because of the differences in the statutes and the narrow focus of Section 510, the Court should avoid suggestions to review other anti-retaliation statutes and whistleblower statutes to interpret Section 510. "[T]here are significant differences between ERISA and Title VII, and there are even differences between the anti-retaliation provisions of the two statutes." *Billoe v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 892 (7th Cir. 2001). Because of the differences in statutes, the Court must resist adopting a 'one size fits all' approach to retaliation and whistleblower statutes.

That Congress intended a narrow scope for protections available under Section 510 is confirmed when Section 510 is compared with the anti-retaliation provisions found in Title VII. Congress inserted two (2) anti-retaliation clauses into Title VII; a "participation" clause and the "opposition" clause. The participation clause, which is similar to Section 510, does not protect employees from retaliation based on internal complaints. *Jackson v. Bd. of Edu.*, 494 Fed. Appx. 539, 543 (6th Cir. 2009)[8] (protecting against retaliation on the basis of an employee charge, testimony or participation in an investigation) *See also, Hatmaker v. Memorial Medical Center*, 619 F.3d 741, 743 (7th Cir. 2010). The

---

[8] A copy of Jackson is at Addendum 1.

Troy_722694_1

participation clause also does not protect employee complaints made as part of a "purely internal investigation." *Hatmaker*, 619 F.3d at 747. In contrast, Title VII's second clause, the opposition clause, protects employees based on complaints made to their employer. *Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271, 276 (2009). Comparing Title VII's anti-retaliation provision against ERISA's anti-retaliation provision shows the difference in Congressional intent.

    *Edwards* also compared Section 510 to the anti-retaliation provision of Title VII and recognized the non-application of Title VII::

> [E]ven beyond the plain meaning of "inquiry" and "proceeding," the phrase "testified or is about to testify" implies that the phrase "inquiry or proceeding" is limited to more formal actions. **Not all anti-retaliation statutes are so limited. In drafting § 1140, Congress could have used broad language similar to that present in the anti-retaliation provision in Section 704(a) of Title VII**, which extends broad protection to employees that have "opposed any practice made an unlawful employment practice by [Title VII.]" **Congress declined to do so, and…we find this choice to be persuasive.**

*Edwards*, 610 F.3d at 223-224 (Citations omitted; emphasis added)

    Congress purposefully placed both the participation clause and the opposition clause into Title VII to provide employees with anti-retaliation protection to cover two different situations, for both complaints made to the

38

employer and external complaints. Absent from ERISA is the opposition clause found in Title VII. Congress' decision to omit an opposition clause or similar language from ERISA confirms that Sexton's email does not constitute protected activity under ERISA and that Title VII is not an analogous statute which either Sexton or the Secretary can rely.

Furthermore, an opposition clause is not integral to ERISA the way that it is to Title VII. As enforcement of Title VII (and similar statutes like the FLSA and NLRA) is driven from employee complaints. Employee complaints in an ERISA setting are not as necessary compared to Title VII or the FLSA, as ERISA contains comprehensive safeguards to secure employee pension rights. *Ingersoll-Rand*, at 137.

First, ERISA makes plan fiduciaries personally liable for breaching any of their obligations or responsibilities under an ERISA plan and may also make the fiduciaries liable for breached by their co-defendants. *Nicolaou,* 402 F.3d at 330 (Pooler, J., concurring). (See also, *Authier,* 757 F.2d at 799, *citing* 29 U.S.C. Section 1109(a) and 19 U.S.C. Section 1105)   As such, to avoid personal liability a fiduciary is strongly encouraged to remedy violations. *Id*.

Second, the enforcement of ERISA is not as dependent upon internal complaints the way that Title VII is because there is an internal mechanism for

Troy_722694_1

reporting violations. Because ERISA has substantial reporting and record keeping requirements. 29 U.S.C. Section 1059. Once a violation occurs, the information necessary to prove that violation is likely contained within those records and participation of the employees may not be necessary because of proof of the violation already exists in the records. Accordingly, employee complaints are not arguable necessary to monitor or enforce ERISA as they are for Title VII. *See,* **Silence is Golden: Excluding Internal Complaints From ERISA Section 510**, Kansas Law Review (Rosenberg 2011).

Any reliance by Sexton and the Secretary on ***Kasten v. Saint Gobain Performance Plastics Corp.,*** 131 S.Ct. 1325 (2011) for the proposition that ERISA's anti-retaliation protections extend to his email is also misplaced. ***Kasten*** does not stand for the broad proposition that all anti-retaliation/whistleblower statutes must be broadly construed to extend past the literal statutory terms.

In ***Kasten,*** the Supreme Court addressed the anti-retaliation provision of the Fair Labor Standards Act ("FLSA"), 29 USC 215(a)(3), which specifically includes the term "complaints" under its umbrella of coverage. ***Kasten,*** 131 S.Ct. at 1330. The issue was whether the definition of "filed any complaint" under the FLSA included oral as well as written complaints. ***Kasten,*** 131 S.Ct. at 1330-31. In analyzing the issue, the Supreme Court first reviewed the definition of 'filed'

Troy_722694_1

and found that the definitions of 'filed' included both oral and written action. ***Kasten,*** 131 S.Ct. at 1331.  Only after finding multiple definitions of the term 'filed' included both oral and written action and examining the illiteracy rates in the 1930s did the Supreme Court conclude that the FLSA's "complaint" included oral complaints.  ***Kasten,*** 131 S.Ct. at 1333-1336.

In the instant case, the broad "complaint" is absent from Section 510.  Here, the critical word is "inquiry" and there is only one understanding, a common understand of "inquiry" -- a request for information.  There is no authority to look past Section 510 to alter the conclusion that Sexton did not give information in any inquiry. If Congress wanted Section 510 to address employee "complaints," it could have easily added the term "complaints" to the statute.  ***Edwards,*** 610 F.3d at 220.  By including the term 'complaints' in the FLSA and omitting that term in ERISA, it shows the clear intention of Congress that not every employee statement or complaint regarding ERISA constitutes protected activity.

Likewise, ***NLRB v. Scriviner,*** 405 U.S. 117, 92 S.Ct. 798 (1972) provides no respite to Sexton or the Secretary.  ***Scriviner,*** arising under Section 8(a)(4) of the National Labor Relations Act ("NLRB"), 29 USC 158(a)(4), does not stand for some universal broad interpretation of anti-retaliation/whistleblower statutes.

Troy_722694_1

In ***Scriviner,*** the Supreme Court reviewed whether the term "given testimony" under Section 8(a)(4) protected employees discharged for providing sworn affidavits to NLRB field examiners. ***Scriviner,*** 405 U.S. at 118. In finding that the affidavits constituted protected activity, the Supreme Court noted that the NLRB had, since 1934, interpreted the statutory language to cover the affidavits and sworn statements given by employees. ***Scriviner,*** 405 U.S. at 123. Similar to ***Kasten's*** inclusion of "oral" complaints, the Supreme Court's interpretation of "giving testimony" to include "giving affidavits" did not go beyond the Congressional mandate and add another protected act by judicial fiat. It is axiomatic that "giving testimony" includes the giving affidavits. The definition of "testimony" is "evidence that a competent witness under oath or affirmation gives at trial **or in an affidavit** or deposition. **Black's Law Dictionary**, 1485 (Garner, 7th Ed. 1999)(Emphasis added).

Sexton and the Secretary's attempt to bootstrap Title VII, ***Kasten***, and ***Scriviner*** into extra protection beyond the text of Section 510 was prophetically rejected by the Sixth Circuit in ***Hill v. Mr. Money Finance Co.***, 309 Fed.Appx. 950, 961 (6th Cir. 2009).[9] In ***Hill***, this Court has rejected the premise, offered by Sexton and the Secretary, that all whistleblower statutes should be given broad

_____

[9]   A copy of the unreported ***Hill*** is at Addendum 1.

42

interpretation that is most favorable to whistleblowers. "[T]here is no rule that all statutes addressing related topics mean the same thing – let alone that all statutes should receive the reading most favorable to whistleblowers." *Hill*, 309 Fed.Appx. At 961 (Citation omitted).

*Hill* is on point. The Court analyzed a whistleblower statute requiring the filing of information with government authorities to trigger protection under the Federal Deposit Insurance Act, 12 USC 1831j ("FDIA") which protects an employee "who files information regarding 'a possible violation....'" *Hill,* 309 Fed.Appx. at 960. Although the plaintiff only reported misconduct internally to his employer, he sought protection under the FDIA arguing like the Sexton and Secretary, "[t]hat whistleblower statutes ought to be construed liberally to protect internal whistleblowing." *Id.* In rejecting plaintiff's argument, this Court found that the whistleblower provision unambiguously did not protect internal complaints. *Hill,* 309 Fed.Appx. at 961.

The *Hill* Court also rejected plaintiff's argument that by not protecting internal complaints, an employee may be subject to preemptive retaliation before he had an opportunity to file a complaint with the government. *Id.* Rejecting that theory, this Court explained:

43

> [I]t is difficult to see why the argument for extending the clear and unambiguous statutory language to cover preemptive retaliation does not fail for the same reason as the argument for extending the same language to cover internal whistle-blowing. The same plain and unambiguous language that excludes internal whistle-blowing also excludes an unrealized intention to blow the whistle.

*Hill,* 309 Fed.Appx. at 962.

The instant case is no different.  Similar to *Hill,* Section 510 does not provide preemptive protection to employees who do not give information in an inquiry.  Like the plaintiff in *Hill,* Sexton did not avail himself of Section 510 protections.  By not engaging in protected activity, Sexton is not afforded the protections of Section 510 and Section 510 cannot be expanded to add other types of acts which Sexton, the Secretary, or the Court would like to cover.

It is too clear that if Congress intended to provide protection for Sexton's email, or for all employee complaints, as it did in other statutes, it could have easily done so by adding the term "complaint" or "opposition" into Section 510.  Congress did not do so.  Neither "complaint" nor "opposition" appear in Section 510 and this Court has acknowledged it should not "[Read] words or elements into a statute that do not appear on its face."  *County of Oakland,* 716 F.3d at 940 (*quoting, Bates v. United States,* 522 U.S. 23, 29, 119 S.Ct. 28 (1997)).  This includes adding elements into Section 510 that address Sexton's and the

44

Secretary's perceived inadequacies with the statute. It is not the Court's role to address perceived inadequacies in a Statute." *Id.* (citation omitted).

### 6. The Secretary Is Not Entitled To Deference On His Interpretation Of Section 510

The Secretary claims that this Court should defer to his interpretation of Section 510 based on ***Skidmore v. Swift & Co.,*** 323 U.S. 134 (1994). Deference to the Secretary is not required or appropriate here. The deference request must be rejected.

Deference to the Secretary must be rejected because Congress has not delegated administrative authority to him. Indeed, "A precondition to deference … is a congressional delegation of administrative authority." ***Adams Fruit Co., Inc. v. Barrett,*** 494 U.S. 638, 649, 110 S.Ct. 1384 (1990). Deference must be rejected where the statute at issue "is not administered by any agency but by the courts." *Id.* (citation omitted).

Cases cited by the Secretary do not change the analysis that deference is not afforded where Congress has not delegated administrative authority to the Secretary. As all of the cases cited by the Secretary, involve statutes that Congress has delegated administrative authority to the Secretary. ***See, Skidmore v. Swift & Co.,*** 323 U.S. 134 (1994)(deciding a FLSA issue), ***Kasten,*** 131 S.Ct. at

45

(interpretation of the FLSA); ***Auer v. Robbins,*** 519 U.S. 452 (1997) (FLSA wage

and hour issue); ***North Folk,*** 691 F.3d 737 (Mine Safety and Health Act); ***Chao v.***

***Occupational Safety Health Review Comm'n.***, 540 F.3d 519 (6th Cir.

2008)(OSHA).

This same argument was made to and rejected by the Seventh Circuit in

***George.***  Accordingly, deference to the Secretary must be rejected because

"Congress has expressly established the Judiciary and not the Department of Labor

as the adjudicator or private rights of action under the statute.  ***Adams,*** 494 U.S. at

649; ***George.*** 694 F.3d at 816.

## Conclusion

For all of the above and foregoing reasons, Panel submits that the appeal

must be denied.

<div style="margin-left:40%">

BODMAN PLC

By:   /s/ Donald H. Scharg
      Steven J. Fishman (P13478)
      Donald H. Scharg (P29225)
      David A. Malinowski (P72076)
201 W Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
Attorneys for Defendants-Appellees

</div>

46

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

RE 1-2    Complaint

RE 9     Defendant's Motion for Summary Judgment (June 26, 2012)

RE 9-2    Deposition of Brian Sexton (May 30, 2012)

RE 9-7    Panel Processing, Inc. Employee Stock Ownership and Money Purchase Pension Trust Agreement

RE 9-8    March 4, 2011 letter to Brian Sexton

RE 9-11   April 29, 2011 meeting minutes of The Board of Directors of Panel Processing, Inc. and its subsidiaries

RE 9-13   Brian Sexton's May 2, 2011 e-mail

RE 13    Plaintiff's Response to Defendants' Motion for Summary Judgment (July 24, 2012)

RE 13-2   Affidavit of Brian Sexton (July 24, 2012)

RE 13-3   Bylaws of Panel Processing, Inc.

RE 16    Opinion and Order Granting in Part Defendants' Motion for Summary Judgment and Declining Jurisdiction over Plaintiffs' State Law Claim (October 30, 2012)

RE 21    Opinion and Order Denying Defendants' Motion for Reconsideration (April 12, 2013)

RE 22    Notice of Appeal (May 6, 2013)

Troy_722694_1

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2013, the foregoing Brief of Defendants – Appellees was served by electronic mail upon the following:

Stephen Silverman
U.S. Dept. of Labor
Silverman.stephen@dol.gov

BODMAN PLC

By:   /s/ Donald H. Scharg
         Steven J. Fishman (P13478)
         Donald H. Scharg (P29225)
         David A. Malinowski (P72076)
201 W Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
Attorneys for Defendants-Appellees

48

Troy_722694_1

## Certificate of Compliance with Type-Volume Limitation

I hereby certify that this brief complies with the type-face and volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7)(c) as follows: the type face is fourteen (14) point Times New Roman font, and number of words is 9,315 according to the Word word count function.

/s/ Donald H. Scharg
By:    Donald H. Scharg
Bodman PLC
201 West Big Beaver, Suite 500
Troy, MI 48084
Phone: (248) 734-6024
Fax: (248) 734-6002
Email:   dscharg@bodmanlaw.com

49

**ADDENDUM 1**

Attached as an addendum to this Brief are the following unpublished cases:

1. *Jackson v. Bd. of Edu.*, 494 Fed. Appx. 539 (6th Cir. 2009)

2. *Hill v. Mr. Money Finance Co.*, 309 Fed. Appx. 950 (6th Cir. 2009).

# EXHIBIT 1

Westlaw.

494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)), 289 Ed. Law Rep. 556
**(Table, Text in WESTLAW), Unpublished Disposition**
(Cite as: 494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)))

**H**
. NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA6 Rule 28 and
FI CTA6 IOP 206 for rules regarding the citation of
unpublished opinions.)

United States Court of Appeals,
Sixth Circuit.
Janice L. JACKSON, Plaintiff–Appellant,
v.
BOARD OF EDUCATION OF THE MEMPHIS
CITY SCHOOLS OF MEMPHIS, TENNESSEE;
Margaret McKissick–Larry; Kimkea Harris, De-
fendants–Appellees.

No. 10–5937.
Aug. 14, 2012.

**Background:** African-American teacher's assistant
brought Title VII suit against city board of educa-
tion and school officials, alleging that her transfer
to another school where she earned less money con-
stituted retaliation for her opposition to racial dis-
crimination. The United States District Court for
the Western District of Tennessee granted summary
judgment to defendants, and plaintiff appealed.

**Holding:** The Court of Appeals, Damon J. Keith,
Circuit Judge, held that plaintiff failed to establish a
prima facie case under Title VII that her transfer to
another school constituted retaliation for letter she
sent to African-American principal asserting that
principal engaged in racially discriminatory treat-
ment when principal admonished her for being out
of her classroom.
    Affirmed.

West Headnotes

Civil Rights 78 ⊜⟶1249(1)

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1249 Public Employment
                78k1249(1) k. In general. Most Cited
Cases
    African-American teacher's assistant failed to
establish a prima facie case under Title VII that her
transfer to another school constituted retaliation for
letter she sent to African-American principal assert-
ing that principal engaged in racially discriminatory
treatment when principal admonished her for being
out of her classroom on certain date; assistant failed
to demonstrate that she had a reasonable and good-
faith belief that principal discriminated against her
on the basis of race when principal admonished her.
Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. §
2000e–3(a).

**\*539** On Appeal from the United States District
Court for the Western District of Tennessee.

Before: KEITH, BOGGS, and MOORE, Circuit
Judges.

DAMON J. KEITH, Circuit Judge.
    **\*\*1** Plaintiff–Appellant Janice Jackson appeals
a district court order granting summary judgment to
Defendants–Appellees in her Title VII action for re-
taliation. Jackson worked as a teacher's assistant at
Avon Lenox School in Memphis, Tennessee. Jack-
son claims that as a result of her opposition to what
she alleged was racial **\*540** discrimination by De-
fendant–Appellee Margaret McKissick–Larry, she
was transferred to another school site where she
earned less income. The district court found that
because Jackson's opposition to an admonishment
by McKissick–Larry was unreasonable, she could
not establish a prima facie case of retaliation. For
the following reasons, we AFFIRM.

I.
    Janice Jackson, an African–American female,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)), 289 Ed. Law Rep. 556
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)))

has been employed as a teacher's assistant by the Board of Education of the Memphis City Schools since January 2004. From January 2004 until October 20, 2006, Jackson worked at Avon Lenox School, a Memphis city school that serves only students with special needs between the ages of 14 and 21 years. During Jackson's assignment at Avon Lenox School, Margaret McKissick–Larry, also an African–American female, served as the principal. The staff at Avon Lenox School was 97% African American and only two of the thirty-one teacher's assistants were White.

On September 19, 2006, McKissick–Larry approached Jackson in the hall and admonished Jackson for being out of the classroom. McKissick–Larry instructed Jackson that she needed to be in the classroom and advised Jackson to monitor her breaks. McKissick–Larry also expressed concerns about a possible inappropriate personal relationship with a male co-worker, Terry Sudduth. Jackson claimed that, at the time of the admonishment, she was en route to the laundry room to pick up clothes for one of the students in her classroom. Prior to September 19, 2006, McKissick–Larry had never criticized Jackson for spending an excessive amount of time outside her assigned classroom or with Sudduth.

The next day, on September 20, 2006, Jackson drafted a personal letter addressed to McKissick–Larry as a written response to McKissick–Larry's verbal admonishment. In her letter, Jackson opined that the confrontation was "unprofessional and improper." Jackson also indicated that she felt unfairly singled out and that her White co-workers were allowed "duty[-]free breaks," while African–Americans were "criticized for taking breaks." To Jackson, this alleged discriminatory treatment constituted "a clear violation of the Civil Rights Act of 1964."

In response to Jackson's letter, McKissick–Larry wrote a memorandum ("memo") dated October 3, 2006, in which she expressed concerns about Jackson's professional conduct. The concerns cited in the memo generally involved: (1) the relationship between Jackson and Sudduth; (2) Jackson visiting other classrooms; (3) propping open the outside doors to the building; (4) an incident in which Jackson photographed a teacher curling another teacher's hair in a classroom; and (5) having unauthorized conferences with parents.

**2 McKissick–Larry noted in her memo that "[o]n numerous occasions [she has] discussed with [Jackson] the issue of public displays of a very private and personal social relationship." She wrote that Jackson and Sudduth—whom McKissick–Larry referred to as "your friend"—spent "an inordinate amount of time talking in the hall," "sitting on the bench," and "at [their] classroom doors." Jackson denied spending an inordinate amount of time talking to Sudduth in the hall or taking excessive breaks with him.

The second concern addressed in McKissick–Larry's memo was Jackson visiting unassigned classrooms during instructional time. McKissick–Larry described this as "a serious problem." The memo alleged that on one occasion when Jackson was visiting a classroom, she violated the school's nutritional policy by giving snacks *541 to a student. Jackson claimed that it was another teacher's assistant who gave the student trail mix. Jackson further contended that she was not conducting a "classroom visit," but rather discussing a pertinent matter with the transportation coordinator.

Third, the memo expressed a concern that Jackson "compromised the security of the building" by violating the school policy that requires that all exterior doors remain closed. McKissick–Larry's memo alleged that Jackson either opened an exterior door and left it open or found an exterior door open and chose not to close the door. At Avon Lenox School a door propped open can create a safety and security issue since students confronted with an open door can either flee from the school or simply walk out the door not realizing the potential for danger. Jackson acknowledged that a door was propped open, but denied being the one who

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)), 289 Ed. Law Rep. 556
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)))

propped the door open. Jackson claimed that she was just outside the door using her cell phone, and the door was already propped open when she ex- ited.

The fourth concern involved an incident in which Jackson photographed two teachers, one of whom was styling the other's hair in the classroom using a hot-roller set. This incident occurred in April 2006, while McKissick–Larry was absent. McKissick–Larry's memo expressed a concern that the photograph was sent to the Executive Director of the Division of Exceptional Children and Health Services, Dr. Partricia Toarmina, only after Jackson was reprimanded, six months later, in September 2006. The memo further expressed concerns that the photograph was misleading and violated the pri- vacy rights of the teachers who were photographed. Jackson claimed that she originally sent the photo- graphs to Dr. Toarmina in April 2006, and only re- sent the photographs to Dr. Toarmina upon her re- quest in September 2006. McKissick–Larry was un- aware of the April 2006 incident until she received an email from Dr. Toarmina on September 25, 2006. Upon witnessing the teacher rolling another teacher's hair, Jackson reported the incident to the then-acting principal, Juanita Voss, who did not in- form McKissick–Larry of the incident.

**3 The final concern expressed in McKissick–Larry's October 3 memo involved Jack- son's alleged unauthorized conferences with par- ents. The memo stated that McKissick–Larry dis- courages a teacher's assistant from holding confer- ences with parents. McKissick–Larry believed that conferencing with parents is the role of the teacher. The memo admonished Jackson to "never initiate a conversation where the teacher's credibility is at- tacked." Jackson admitted that, on more than one occasion, she had discussions with parent Sheila Eastling about her son, Darien Campbell, who was a student at Avon Lenox School, but Jackson denied that she had any inappropriate "conference" with a parent.

Notwithstanding the criticism and concerns ex-

pressed in McKissick–Larry's memo, the memo also applauded Jackson's performance. The memo stated, "You will notice that very little has been said regarding your classroom performance. I am of the opinion that you have a lot to offer the classroom and students.... [I]t appears that other concerns have taken priority and are shadowing your good work with the classroom with the stu- dents to which you are assigned."

On October 3, 2006, McKissick–Larry met with Jackson and Memphis Education Association representative Tom Marchand to discuss the issues raised in McKissick–Larry's memo. Shortly after the meeting, Jackson wrote a memo titled: "Response to the Oct 3, 2006 Meeting." In her memo, Jackson rebutted the concerns and allega- tions outlined in McKissick–Larry's *542 October 3, 2006 memo. Jackson also alleged that "[a] hos- tile work environment has been created."

On October 11, 2006, McKissick–Larry wrote a memo to Labor Relations Administrator Kimkea Harris opining that Jackson "should be moved to another site" and "[g]etting off to a new start will help her get back on target." On October 17, 2006, Jackson and Marchand met with Harris to discuss the allegations made in McKissick–Larry's memo. During that meeting, Jackson denied most of the al- legations contained in the memo. In Marchand's notes of the meeting, he indicated that Harris in- formed Jackson that the Board viewed her letter quoting the Civil Rights Act as a threat. Marchand's notes also indicated that Harris advised Jackson to not use the term "hostile environment" or "retaliation." In a letter dated October 19, 2006, Harris informed Jackson that discipline was war- ranted. Harris also stated that the letter "shall serve as a written reprimand and ... will be placed in [Jackson's] file." The letter informed Jackson that she would be "transferred to another location." Fi- nally, the letter warned that "any future infractions of rules, policies, or procedures of the Memphis City Schools or any referral to the Division of Labor and Employee Relations may lead to more

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)), 289 Ed. Law Rep. 556
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)))

stringent disciplinary action."

Jackson was given a choice concerning which school she transferred to, and she selected to transfer to Wooddale High School. Jackson contends that there were no transfer options available for a school that would provide her the same opportunity to earn the overtime compensation that she received at Avon Lenox by escorting students to and from school on a bus. Jackson's hourly rate of pay as a teacher's assistant did not change after she was reassigned to Wooddale High School; however, she contends that her compensation was significantly reduced as the result of her reassignment because she was unable to escort students to and from school at Wooddale. Jackson claims that, as a result of the reduction in her earnings, she became financially insolvent and was forced to seek wage-earner protection under Chapter 13 of the Bankruptcy Code.

**4 Jackson initiated this action on July 26, 2007, alleging that McKissick–Larry had unlawfully retaliated against her in response to her letter dated September 20, 2006. Jackson's complaint alleged retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–3(a) ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 (" § 1981 "); the Tennessee Human Rights Act ("THRA"), T.C.A. § 4–21–301 *et seq.;* and the Civil Rights Act of 1871, 42 U.S.C. § 1983 (" § 1983").

On January 7, 2010, the district court entered an order granting summary judgment in favor of the defendants on all claims. The district court found that the anti-retaliation clause of Title VII was not implicated because Jackson did not show a reasonable and good-faith belief that her opposition, here in the form of the September 20, 2006 letter, was a result of unlawful discrimination. The court then concluded that Jackson was unable to establish a prima facie case of retaliation because she had not shown that she engaged in Title VII-protected activity.

II.

We review a district court's grant of summary judgment de novo. *Bryson v. Middlefield Volunteer Fire Dep't, Inc.,* 656 F.3d 348, 351 (6th Cir.2011). Summary judgment is required when the movant shows that "there is no genuine dispute as to any material fact" and he or she is "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The substantive law will determine which facts are material. *543 *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether there is a genuine issue of material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. However, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient." *Id.* at 252, 106 S.Ct. 2505. Rather, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.*

Jackson alleges that Defendants–Appellees unlawfully retaliated against her as a result of her September 20, 2006 letter. Jackson's claims arise under the anti-retaliation provisions of Title VII. FN1 Title VII makes it unlawful for an employer to discriminate against an employee either because the employee "has opposed any practice made an unlawful employment practice" (referred to as the "opposition clause") or because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]" (referred to as the "participation clause"). 42 U.S.C. § 2000e–3(a). "Unlawful employment practices under Title VII include any actions taken on the basis of race, color, religion, sex, or national origin that 'discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment.' " *Niswander v. Cincinnati Ins.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)), 289 Ed. Law Rep. 556
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)))

*Co.,* 529 F.3d 714, 720 (6th Cir.2008) (quoting 42 U.S.C. § 2000e–2). Because Jackson alleges that her letter was the basis for retaliation, and not her participation in a Title VII proceeding, we interpret her claim under the "opposition clause."

> FN1. Jackson's retaliation claims under THRA and § 1981 are governed by the same burden-shifting standards as the Title VII claims. Thus, the analysis and conclusions concerning the Title VII claims apply equally to parallel claims brought under THRA and § 1981. *Wade v. Knoxville Utils. Bd.,* 259 F.3d 452, 464 (6th Cir.2001); see also *Newman v. Fed. Express Corp.,* 266 F.3d 401, 406 (6th Cir.2001) (plaintiff's failure to establish a Title VII prima facie case governs the outcome of § 1981 and THRA claims).

**\*\*5** In order to establish a prima facie case under the opposition clause, the "[p]laintiff must meet the test of a slightly modified *McDonnell Douglas* framework." *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 578 (6th Cir.2000). Plaintiff must show: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the employer; (3) the employer thereafter took an adverse employment action against the employee; and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.* If the plaintiff establishes a prima facie case, then the burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* The plaintiff then is required to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for retaliation. *Abbott v. Crown Motor Co.,* 348 F.3d 537, 542 (6th Cir.2003). "Throughout the entire *McDonnell Douglas* framework, the plaintiff bears the burden of persuasion." *Id.*

Jackson argues that Defendants–Appellees retaliated against her because of her opposition to alleged unlawful employment practices—namely, her opposition to discriminatory treatment of Afric-

an–American teacher's assistants, as compared to the White teacher's assistants. The opposition clause does not protect all opposition activity. *\*544 Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir.1989) (citation and quotation marks omitted). "Courts are required to balance the purpose of [Title VII] to protect persons engaging reasonably in activities opposing ... discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Id.* (citation and internal quotation marks omitted). "The EEOC has qualified the scope of the opposition clause by noting that the manner of opposition must be reasonable, and that the opposition be based on 'a reasonable and good faith belief that the opposed practices were unlawful.' " *Johnson,* 215 F.3d at 579 (quoting *EEOC Compliance Manual,* (CCH) ¶ 8806); *see also Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (retaliation claim under Title VII defeated where no reasonable person would believe that the activity opposed by employee violated Title VII).

To make out her a prima facie case, Jackson, bearing the burden of persuasion, was required to demonstrate by a preponderance of the evidence that she had a reasonable and good-faith belief that McKissick–Larry violated the law when she admonished Jackson for being out of the classroom on September 19, 2006. The district court concluded that Jackson failed to meet her burden by failing to show that her belief that McKissick–Larry discriminated on the basis of race to be reasonable. We agree.

Even under a view of the evidence in the light most favorable to Jackson, Jackson cannot show that McKissick–Larry acted with racial animus or discriminatory intent against African–Americans in reprimanding Jackson. On September 19, 2006, McKissick–Larry confronted Jackson in the hall and outside of her classroom. Although the parties dispute whether Terry Sudduth was with Jackson

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)), 289 Ed. Law Rep. 556
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)))

when McKissick–Larry decided to approach, there is no dispute that Jackson was not in her assigned classroom. McKissick–Larry instructed Jackson that she needed to be in the classroom and advised Jackson to monitor her breaks. McKissick–Larry then went on to express concerns about what some of the staff, including herself, perceived as "public displays of a very private and personal social relationship." McKissick–Larry felt a responsibility as the administrator to "express her concerns" and advise Jackson to "be more discreet in consideration of [her] own privacy and respect for the professional setting in which many of [the] displays were occurring."

**6 In Jackson's letter to McKissick–Larry, she mentioned that co-workers of a different ethnic background, namely the two White teacher's assistants, were not reprimanded and enjoyed "duty[-]free breaks, while African American co-worker[s] [were] criticized for taking breaks." Jackson has not pointed us to any evidence that we could consider on summary judgment in support of her claim that she reasonably believed that McKissick–Larry was discriminating against African Americans or treating them differently with respect to taking breaks. Jackson has not proffered any evidence that the two White teacher's assistants similarly displayed a private and personal relationship at the school and then escaped reprimand by McKissick–Larry. Even assuming that Jackson believed in good faith that McKissick–Larry's actions violated Title VII, no reasonable jury could find, based on the factual record developed below, that McKissick–Larry's reprimand on September 19, 2006, constituted a violation of Title VII. To hold that opposition is reasonable when the employer is addressing an apparent and legitimate personnel matter in a way that does not explicitly or implicitly implicate Title VII, with no other testimony or evidence of racial discrimination, would hamper an employer's ability to address legitimate issues for fear that doing so could leave the **545 employer vulnerable to liability under Title VII.

In support of Jackson's contention that her opposition was reasonable, Jackson highlights parts of her deposition and the deposition of another teacher, in which the two allege that McKissick–Larry made "racist statements." Jackson alleges that McKissick–Larry stated that she does not "deal with Black doctors or dentists because Whites always go to school more." These statements do not substantially assist Jackson in satisfying her burden to show that her opposition on September 20, 2006, was reasonable. These statements, even if true, do not show that McKissick–Larry treated her African–American staff any differently than her White staff when she gave Jackson a verbal admonishment for being out of the classroom. Further, there is no indication that these alleged comments were made at or near the time that Jackson was admonished. The comments also do little in showing that McKissick–Larry harbored any racial animus toward her 97% African–American staff. Jackson also alleges that McKissick–Larry distributed an "offensive magazine article," titled, "Why Do Black Women Despise Each Other?" Accepting Jackson's allegation that McKissick–Larry distributed this article to be true, we still find the use of this particular article as indicia of McKissick–Larry's racial hostility to be similarly flawed.

III.

Jackson has not shown that she reasonably opposed a protected activity, and she thus has not made a prima facie showing under the *McDonnell Douglas* framework. We therefore AFFIRM the judgment of the district court.

C.A.6 (Tenn.),2012.
Jackson v. Board of Educ. of Memphis City Schools of Memphis, Tenn.
494 Fed.Appx. 539, 2012 WL 3326305 (C.A.6 (Tenn.)), 289 Ed. Law Rep. 556

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 2

**Westlaw.**

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

**H**
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Sixth Circuit Rule 28. (Find CTA6 Rule 28)

United States Court of Appeals,
Sixth Circuit.
Gregg HILL, Plaintiff-Appellant, Cross-Appellee,
v.
MR. MONEY FINANCE COMPANY & FIRST
CITIZENS BANC CORPORATION, Defendants-
Appellees, Cross-Appellants.

Nos. 07-3907, 07-3908.
Feb. 6, 2009.

**Background:** Former executive of subprime lender brought action alleging that he was terminated in retaliation for his whistleblower activities. Employer filed counterclaim for sanctions. The United States District Court for the Northern District of Ohio, 491 F.Supp.2d 725, entered summary judgment in employer's favor, but declined to impose sanctions. Parties filed cross-appeals.

**Holdings:** The Court of Appeals, Boggs, Chief Judge, held that:
(1) executive was not protected from retaliatory termination under Ohio whistleblower law;
(2) executive of subprime lender was not protected from retaliatory termination by Federal Deposit Insurance Act's (FDIC) whistleblower provisions; and
(3) district court did not abuse its discretion in denying employer's motion for sanctions.

Affirmed.

West Headnotes

[1] Banks and Banking 52 ⟨—⟩51

52 Banks and Banking
52II Banking Corporations and Associations
52II(D) Officers and Agents
52k51 k. Election or appointment, qualification, and tenure. Most Cited Cases
Bank executive did not make reasonable and good faith effort to investigate misconduct allegations against another employee, and thus was not protected from retaliatory termination under Ohio whistleblower law, where executive was merely conduit who handed over documents that other employees had assembled to company's director, and executive made no effort to determine whether employee's violations were felonious. Ohio R.C. § 4113.52.

[2] Banks and Banking 52 ⟨—⟩51

52 Banks and Banking
52II Banking Corporations and Associations
52II(D) Officers and Agents
52k51 k. Election or appointment, qualification, and tenure. Most Cited Cases
Former executive of subprime lender was not protected from retaliatory termination by Federal Deposit Insurance Act's (FDIC) whistleblower provisions, even though executive revealed misconduct by another employee to lender's board of directors, and indicated his intention to file suspicious activity report (SAR) with federal authorities, where executive did not report relevant information to any federal supervisory agency until after his termination. Federal Deposit Insurance Act, § 2[33], 12 U.S.C.A. § 1831j; 31 U.S.C.A. § 5328.

[3] Banks and Banking 52 ⟨—⟩51

52 Banks and Banking
52II Banking Corporations and Associations
52II(D) Officers and Agents
52k51 k. Election or appointment, qualification, and tenure. Most Cited Cases
Under Ohio law, subprime lender's decision to terminate employee after he reported misconduct by

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

its president to corporate board did not amount to wrongful discharge in violation of public policy, despite employee's contention that his termination violated public policy set forth in state and federal whistleblower statutes, where employee did not report misconduct to any governmental entity, as required by statutes. Federal Deposit Insurance Act, § 2[33], 12 U.S.C.A. § 1831j; 31 U.S.C.A. § 5328; Ohio R.C. § 4113.52.

[4] Federal Civil Procedure 170A ☞2786

170A Federal Civil Procedure
    170AXX Sanctions
        170AXX(B) Grounds for Imposition
            170Ak2767 Unwarranted, Groundless or Frivolous Papers or Claims
                170Ak2786 k. Extension or modification of existing law. Most Cited Cases
    District court did not abuse its discretion in denying bank's motion for sanctions against former employee who filed retaliatory discharge suit against it, even if employee had sought legal counsel prior to termination and had filed complaint several times in state and federal courts, and bank prevailed on its motion for summary judgment, where employee did not submit to court any pleadings, motions, or papers that were unwarranted by nonfrivolous extension of law. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.


*951 On Appeal from the United States District Court for the Northern District of Ohio.

Before: BOGGS, Chief Judge; and GIBBONS and GRIFFIN, Circuit Judges.


*952 BOGGS, Chief Judge.
    **1 Gregg Hill sued First Citizens Banc Corp. and Mr. Money Finance Co. ("First Citizens" and "Mr. Money"; collectively, "Defendants") for retaliation and wrongful termination, in violation of Ohio and federal whistleblower laws, and Ohio public policy. Defendants counterclaimed, seeking sanctions, alleging frivolous conduct by Hill under

Ohio Civ. R. 11, Ohio Rev.Code § 2323.51 and Fed.R.Civ.P. 11. The district court granted Defendants' motion for summary judgment on the substantive claims and then granted Hill's motion for judgment on the pleadings as to the sanctions. Both parties appeal the district court's rulings. We affirm the district court's grant of both motions.

I
A. Factual Background
    First Citizens, a bank holding company, organized Mr. Money as a finance company in 2000. At the time, the Chief Executive Officer ("CEO") of First Citizens was David Voight, the Executive Vice President was Jim Miller, the human resources director was Michael Powell, the compliance officer was Vicky Doski, and its outside counsel was Jim McGookey. Mr. Money was a subprime lender, providing loans to customers who presented unusual credit risks and would normally not qualify for bank loans. In April 2000, First Citizens hired Arthur Pucci to serve as President and Chief Operating Officer ("COO") of Mr. Money. Hill was hired as senior vice president in April 2000 by Mr. Money. Defendants allege that Pucci and Hill set up a "bonus scheme," whereby a bonus attached to all loans, irrespective of their quality. Hill testifies that he did "not set loan policy, nor put a 'bonus scheme' in place." Hill received a base annual salary of $57,500; he lived in Brunswick, Ohio and drove ninety miles to the Sandusky, Ohio office of Mr. Money three days a week, per the terms of employment set by Pucci. Hill also received a car allowance of six hundred dollars per month, a benefit he did not report as income, in addition to a mileage allowance.

    On or about December 5, 2001, Hill met with James Nabors, a member of Mr. Money's Board of Directors, and presented Nabors with information evidencing misconduct by Pucci. The alleged misconduct included: improper use of the company credit card for over $40,000 in charges including flowers, Victoria's Secret lingerie, and jewelry; an improper loan in the amount of $3,500 to a person

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

who had an Ohio address, even though the loan documents were sent to a New Jersey address; a trip expensed to Mr. Money to attend a predatory-lending seminar in Florida accompanied by a young female employee; and a note loan in the amount of $6,500 to a singer who was hired for the Mr. Money Christmas party, which was based on an overstatement of claimed income. Hill gave Nabors a 54-page document substantiating the alleged misconduct by Pucci. Nabors relayed the information to CEO Voight in a three-page letter detailing Pucci's violations, with the 54 pages provided to him by Hill enclosed; Voight then passed on the three-page letter with the enclosures to outside counsel McGookey. McGookey investigated the allegations and presented his findings to Mr. Money's Board of Directors on December 17, 2001. Pucci was then given, and accepted, the opportunity to resign. Hill alleges that Mr. Money did not report Pucci's conduct to any federal authorities, and that Pucci was allowed to resign to avoid "waves during this merger," referring to a merger *953 that was agreed to, as Defendants show, a month and a half prior to Pucci's termination.

**2 On or about the same day as Pucci's resignation (December 17, 2001), Voight asked Nabors to take over Pucci's duties as a consultant, initially for a six-month period; Bruce Bravard was acting president for some or all of that period. Within three weeks of assuming duties, Nabors replaced the bonus structure, required all employees including Hill to work at the Sandusky office every day, and replaced Hill's car allowance with a reportable-income raise of the same monthly amount ($600). Defendants state, and Hill does not disagree, that Hill complained to Nabors about the changes in his terms of employment. Hill was unhappy with his new employment situation, wanted a higher salary, did not want to work in the Sandusky office five days a week, and thought that Mr. Money reneged on a prior promise to set up an office in Cleveland by 2002 or 2003. In response to Hill's dissatisfaction, Nabors sought to connect Hill with other potential employers. In his deposition, Hill indicated

that throughout January, February and March, Nabors continuously referred Hill to four or five "growing" companies, which would afford Hill the opportunity to earn a higher salary; on at least two occasions, Hill was contacted or approached directly by company representatives interested in potentially hiring Hill.

On February 13, 2002, Hill attended a mandatory "Lunch and Learn" seminar given by First Citizens and led by Doski, at which he learned about the Suspicious Activity Report ("SAR") process. Hill learned that in some instances, such as insider abuse of any amount, or falsified information on a loan, an SAR must be filed with the appropriate federal law enforcement agency [FN1] and the Department of the Treasury. Hill alleges that he informed Nabors during early March that Pucci's conduct triggered SAR reporting obligations. Nabors recalls only a question about an SAR, and not knowing what it was. Hill alleges that he asked Nabors two weeks later whether he had looked into filing an SAR, and Nabors responded in the negative.

FN1. The record is inconsistent with regard to which federal agency is appropriate: both the Federal Reserve and the Federal Trade Commission appear in the record.

Defendants allege that in late February and/or early March, Nabors decided to eliminate Hill's position of senior vice president, as part of a restructuring plan for Mr. Money; they also allege that around March 10 Nabors informed Hill that Nabors was asked to assume the position of President of Mr. Money, effective March 18.

On April 5, 2002, Hill sent a letter to Mr. Money's Board of Directors and to Doski. The letter recalled Hill's December 5, 2001 complaint to Nabors about Pucci's misconduct, stated that Pucci "had improperly, and I believe unlawfully, misused Mr. Money funds, violated state and federal banking regulations, other state and federal laws and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

regulations, and violated the 'Code of Conduct,' " specifically listing several Ohio, New Jersey, and federal laws, and characterizing Pucci's actions as constituting insider abuse and other felonies. Hill noted that "failure to report these violations is itself a violation," and stated his intention to file an SAR, if he is not informed that an SAR has been filed by someone else.

**3 Voight, acting-president Bravard, and Doski all forwarded Hill's letter to McGookey.*954 On April 15, McGookey responded to Hill in a letter, informing him that federal law does not allow disclosure as to whether an SAR has been filed; that Hill's approach to the situation created "disturbing problems"; that Mr. Money has no problem with filing an SAR because it has no reason to protect the resigned Pucci; and that if Hill wanted to file an SAR, he should "go ahead." McGookey also expressed displeasure at Hill's choosing to ignore "the chain of command," and suggested that Hill "manufactured this issue for reasons that have nothing to do with" filing a SAR.

McGookey also advised Doski to seek clarification from the Financial Crimes Enforcement Network ("FinCEN"), a division of the Treasury Department, whether an SAR needed to be filed. Doski contacted FinCEN and inquired about the only allegation made by Hill that she believed was a crime-closing a loan with a person with an Ohio address but sending the documents to New Jersey. FinCEN informed Doski that they did not think it was a crime that required an SAR; on April 12, Doski also sent an email to the Federal Reserve about the same loan, and the Federal Reserve confirmed that no SAR was required.

On April 16, Nabors, Bravard, and Powell held a meeting with Hill and informed him that his position was being eliminated effective immediately, because it "could not be justified based on the direction of the business as well as [Hill's] desire to receive compensation of 100,000 a year...." After the meeting, Hill gave Powell a copy of a letter he mailed the day before, in which Hill detailed what

he thought were retaliatory measures by Mr. Money, including the elimination of his car allowance and the obligation to commute to Sandusky every weekday. At some date the week prior to the meeting, Powell recorded notes on the basis of a phone conversation with McGookey regarding the decision to terminate Hill on April 16th. Powell's notes identify Hill's disappointed hope to become Pucci's successor, Hill's unhappiness at having to work at Sandusky five days a week, Hill's expressed desire to Nabors that he needed a job earning $100,000 a year, and Hill's April 5 letter to the Board of Directors that did not "follow[ ] the appropriate 'chain of command'." The note concludes with what Hill alleges is evidence of retaliatory discharge: "While this last incident was not appropriate, it is a continuation of unacceptable conduct by Gregg. In looking at the performance of Brian Bennis and Gregg Hill, it has been determined by Jim Nabors that he cannot continue to keep both employed and his decision is to terminate Gregg's services." On or about June 18, 2002-after his termination and the filing of the first suit in this dispute-Hill filed an SAR with the Federal Trade Commission.

**B. Procedural Background**

Hill filed his first complaint against Defendants in the Common Pleas Court of Cuyahoga County on June 14, 2002. That case was transferred to the Erie County Common Pleas Court. Hill then commenced this action in the United States District Court for the Northern District of Ohio, Eastern Division, before Judge Donald Nugent, which was dismissed without prejudice. After Hill took a voluntary dismissal of the Erie County Common Pleas Court action, he refiled in the Northern District of Ohio, Western Division. Hill's complaint alleged four causes of action: first, unlawful discrimination and retaliation by Defendants for engaging in activity *955 protected under 12 U.S.C. § 1831j, and second, under 31 U.S.C. § 5328 (collectively, "Federal Whistleblower Statutes"); third, unlawful discrimination and retaliation in violation of the clear public policy of Ohio; and fourth, prohibited

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

discriminatory and retaliatory conduct in violation of Ohio Rev.Code § 4113.52 ("Ohio Whistleblower Statute"). Hill sought in excess of $75,000 in, *inter alia,* compensatory and punitive damages, interest, and attorney's fees.

**\*\*4** Defendants counterclaimed, alleging frivolous and baseless conduct prohibited under Ohio Rev.Code § 2323.51, Ohio Civ. R. 11 and Fed. Civ. R. 11. Defendants filed a motion for summary judgment, and Hill filed motions to dismiss Defendants' counterclaim, to strike certain affidavits, and to strike Defendants' motion for summary judgment. On June 15, 2007, the district court granted Defendants' motion for summary judgment, and Hill's motion for judgment on the pleadings on the counterclaim, which rendered Hill's remaining motions moot.

## II

We review de novo an order granting summary judgment. *Johnson v. Karnes,* 398 F.3d 868, 873 (6th Cir.2005). Summary judgment is appropriate when there are no issues of material fact in dispute and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, we must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We also review de novo a district court's dismissal of a claim pursuant to a Rule 12(c) motion. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,* 342 F.3d 634, 643 (6th Cir.2003). "We read the *Twombly* and *Erickson* decisions in conjunction with one another when reviewing a district court's decision to grant a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12 ." *Sensations, Inc. v. City of Grand Rapids,* 526 F.3d 291, 295-96 (6th Cir.2008) (citing *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929

(2007)). Dismissal on a Rule 12(c) motion is appropriate when the factual allegations contained in the complaint, accepted as true, do not show that the pleader is entitled to relief. While "[f]actual allegations must be enough raise a right to relief above the speculative level," *Twombly,* 127 S.Ct. at 1964-65, "[s]pecific facts are not necessary," *Erickson,* 127 S.Ct. at 2200.

## A. Hill's Wrongful Termination Claim under the Ohio Whistleblower Statute

Hill contends that the district court erred in granting summary judgment in favor of Defendants on Hill's claim of wrongful retaliation in violation of the Ohio Whistleblower Statute. The Ohio Whistleblower Statute grants employees protection in three scenarios, and states in relevant part:

§ 4113.52. Right of employee to report violation of law by employer or fellow employee

(A)(1)(a) If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's\*956 employer has authority to correct, and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation. If the employer does not correct the violation or make a reasonable and good faith effort to correct the violation within twenty-four hours after the oral notification or the receipt of the report, whichever is earlier, the employee may file a written report that provides sufficient detail to identify and describe the violation with the prosecuting authority of the county or municipal corporation where the violation occurred, with a peace officer, with the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

inspector general if the violation is within the inspector general's jurisdiction, or with any other appropriate public official or agency that has regulatory authority over the employer and the industry, trade, or business in which the employer is engaged.

**5 (b) If an employee makes a report under division (A)(1)(a) of this section, the employer, within twenty-four hours after the oral notification was made or the report was received or by the close of business on the next regular business day following the day on which the oral notification was made or the report was received, whichever is later, shall notify the employee, in writing, of any effort of the employer to correct the alleged violation or hazard or of the absence of the alleged violation or hazard.

...

(3) If an employee becomes aware in the course of the employee's employment of a violation by a fellow employee of any state or federal statute, any ordinance or regulation of a political subdivision, or any work rule or company policy of the employee's employer and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation.

(B) Except as otherwise provided in division (C) of this section, no employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(1) or (2) of this section, or as a result of the employee's having made any inquiry or taken any other action to ensure the accuracy of any inform-

ation reported under either such division. No employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(3) of this section if the employee made a reasonable and good faith effort to determine the accuracy of any information so reported, or as a result of the employee's having made any inquiry or taken any other action to ensure the accuracy of any information reported under that division....

(C) An employee shall make a reasonable and good faith effort to determine *957 the accuracy of any information reported under division (A)(1) or (2) of this section. If the employee who makes a report under either division fails to make such an effort, the employee may be subject to disciplinary action by the employee's employer, including suspension or removal, for reporting information without a reasonable basis to do so under division (A)(1) or (2) of this section.

The district court found Hill's claim under the Ohio Whistleblower Statute deficient on two grounds. First, the district court found that Hill had not complied with the statutory requirements to claim relief under § 4113.52(A)(1): in particular, Hill did not demonstrate that Defendants failed to take reasonable action to correct the misdeeds reported by Hill, and Hill did not file a written report with a proper outside agency. Second, the district court found that there is no genuine issue of material fact as to whether Hill made "a reasonable and good faith effort to determine the accuracy" of any information about the alleged violations that he reported, as required by § 4113.52(B) for a claim under (A)(3), and by § 4113.52(C) for a claim under (A)(1).

**6 Hill contests both grounds for the district court's ruling. Hill argues that the district court has "erroneously *combined* the requirements" of § 4113.52(A)(1) *and* § 4113.52(A)(3), and that he "does not claim protections under" § 4113.52 (A)(1). Hill also argues that he produced "overwhelming evidence" for his good faith effort,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

and that, in any case, the determination of whether his efforts were reasonable and in good faith is a question of fact reserved for the jury.

[1] The requirement to make "a reasonable and good faith effort to determine the accuracy of any information" reported applies whether Hill claims protection under § 4113.52(A)(1) or under § 4113.52(A)(3). Even if the district court had erroneously "combined" the requirements of two distinct subsections of the Ohio Whistleblower Statute, Hill's failure to make a reasonable and good faith effort is an independent and sufficient ground to grant summary judgment to the Defendants on this claim. It is unnecessary for us to decide whether the district court erred in applying the requirements of both subsections of the Ohio Whistleblower Statute, because we hold that the district court correctly decided that no genuine issue of material fact exists as to whether Hill made the requisite good faith effort to be protected under that statute.

The Supreme Court of Ohio has explicitly held that if an employee reports a violation of a statute and "that violation is a criminal offense and is likely to cause a hazard to public health, *each* informational component of that report-the violation, criminality, and risk to public safety-is 'information so reported' " under the antiretaliation provisions of the whistleblower statute. *Fox v. Bowling Green,* 76 Ohio St.3d 534, 668 N.E.2d 898, 901 (1996) (emphasis added). An employee is protected from retaliation "as long as he made a 'reasonable and good faith effort to determine the accuracy' of *each* informational element." *Ibid.* (emphasis added). Thus, Hill needed to establish that he has made a reasonable and good faith effort to determine the accuracy of the three informational components applicable to his claim: the violations, the criminality of the violations, and the felonious character of the criminal violations.

Hill does not explicitly claim that he has made the requisite effort with regard to **\*958** each of the three informational components. Instead, Hill lists the following actions taken by him as evidence that

he made a reasonable and good faith effort in general. Hill (1) "gathered the concerns of multiple employees"; (2) assembled these concerns "into a written report," which he presented to Nabors; (3) sought "additional information" on a credit card account when another employee brought her concerns to him, which entailed "obtaining online account information"; (4) reviewed "approximately 54 pages of MasterCard statements, which revealed the specifics of Pucci's activity"; (5) "pulled files to review loans" made to Stacy Mitchell (individual with the Ohio address, whose loan documents were delivered to New Jersey) and singer Colleen Kiley; (6) "read the statutes relating to embezzlement and bank fraud."

**\*\*7** Hill does demonstrate that he transmitted the concerns of multiple employees to Nabors. However, as the district court points out, serving as a "mere conduit" of information does not by itself amount to a reasonable and good faith effort. Hill invokes the authority of the Ohio Supreme Court's ruling in *Contreras v. Ferro Corp.,* 73 Ohio St.3d 244, 652 N.E.2d 940, 945 (1995), which points out the possibility that the same employee may be both a recipient and a reporter of information, and that therefore, "each employee in the chain of command who receives the information and reports it to his or her supervisor is protected from retaliatory action *if the manner in which the information is reported complies with the requirements of the statute.* " (emphasis added). *Contreras* does not help Hill's attempt to establish his good faith effort: it is clear that *only* those employees in the chain of command-only those "conduits"-who satisfy the requirement to make a reasonable and good faith effort to determine the accuracy of information they received and passed on are protected under the statute. In no way does the language in *Contreras* exempt Hill from independently establishing a good faith effort.

Second, Hill claims that he assembled the concerns brought to him by other employees "into a written report," which he then presented to Nabors. As the district court concluded, Hill did no more

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

than "hand[ ] over documents that other employees had assembled" to Nabors. *Hill v. Mr. Money Fin. Co.,* 491 F.Supp.2d 725, 732 (N.D.Ohio 2007). Defendants assert that Hill "compiled no report and handed Nabors fifty-four (54) pages of credit card documents and a few loan documents." The voluminous evidentiary record submitted by both parties does *not* establish what Hill urges is a key part of his good faith effort, the assembling of information into a "*written* report." The evidentiary record suggests strongly that the 54 pages Hill handed over to Nabors to support allegations of Pucci's misconduct were credit card and loan documents accessed and printed by other employees. Hill himself describes the materials he transmitted to Nabors as consisting of Mastercard statements and loan documents. The closest Hill comes in his sworn deposition to substantiating the claim of having actually written anything beyond what was given to him by other employees is in the following statement in his deposition: "I told him [Nabors] about the misconduct. I gave him the 54 pages, and I had written notes on each section." With regard to credit card statements, Hill's deposition states that another employee printed *all* the pages that Hill gave to Nabors:

Q. Did you have available to you the credit card information from Mr. Pucci?

*959 A. No.

Q. Was it on the computer?

A. Only after they told me about these incidences. There was a girl who worked there, Dee Patrick, who had to access the account online and pay it electronically, and from that *she printed me all the pages I gave to Mr. Nabors.* I had never accessed that before.

**8 (emphasis added). At another point in his deposition, Hill confirms that all the documents, not just the credit card statements noted above, were brought to him by other employees:

Q. Mr. Hill, if I understand your testimony, the

employees at Mr. Money laid out for you-they came in with a group of documents and laid out for you this entire case that you then reported to Mr. Nabors; is that correct?

A. Yes.

This quoted record is also pertinent to the third and fourth set of actions Hill cites as evidence of his good faith effort to determine that Pucci's actions were illegitimate or illegal, (3) his seeking "additional information" on a credit card account when another employee brought her concerns to him, which entailed "obtaining online account information", and (4) his review of the "approximately 54 pages of MasterCard statements, which revealed the specifics of Pucci's activity." Hill's statements make evident that the "obtaining" of additional credit card information was done by employee Dee Patrick, and not himself. The record likewise fails to show that Hill sought any information *beyond* that contained in the statements printed by another employee. He states that he did not know nor seek to ascertain whether the bank conducted an audit on the credit card or exactly how much money Pucci paid back, if any.

The most effort Hill exerted with regard to the information contained in the credit card statement is totaling the card charges attributable to Pucci, without explicitly distinguishing between legitimate business expenses and illegitimate charges. The attention Hill accorded to the credit card statements may indeed be a "review" of the information contained therein, but a review of a most superficial kind. Next, Hill maintains that he investigated the allegedly illegal loans made by Pucci by pulling files on these loans made to Stacy Mitchell and singer Colleen Kiley. Hill's statements on the record do confirm that he pulled the loan file on Stacy Mitchell; but, with regard to the Colleen Kiley loan, Hill states in his deposition that this was a "file that Tara and Lisa [i.e. other employees] brought in to me."

To sum up, treating the facts supported by the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

record in a light most favorable to Hill, the most that Hill has done to determine the accuracy of Pucci's violations-the first informational component subject to the good faith requirement-is the following: he looked at the credit card statements and verified the presence of items that were likely to be improper business expenses; he calculated the total charges, including the allegedly illegitimate charges, made by Pucci on the company credit card; and he pulled a file on a loan made to Stacy Mitchell, which may have led Hill to verify the reasonableness of information first reported to him by other employees, because the loan was improperly made to an Ohio resident, but mailed to a New Jersey address.

Hill put considerably less effort into determining whether Pucci's violations were *criminal,* and apparently no effort into determining whether they were likely to be *felonious.* With regard to the criminality*960 of Pucci's conduct, Hill states no more than that he had read "the statute" on embezzlement and bank fraud, although he did not remember it "verbatim," and did not specify whether this occurred at some distant time in the past, or after other employees brought him the documents suggesting that Pucci committed criminal violations.

**9 Crucially, Hill does not claim or point to any part of the record that would establish the requisite effort with regard to determining that Pucci's criminal violations *rose to the level of felonies.* Merely stating in a sworn affidavit that he "believed that these serious crimes were felonies" may conceivably satisfy the requirement that the employee reasonably believed a felony occurred, but it does not satisfy the requirement to make a reasonable and good faith effort to determine the accuracy of that belief. Even if it is not inconceivable that a jury would find reasonable and good faith effort with regard to the first informational component (occurrence of misconduct), it is far less conceivable with regard to the second informational component (criminality of misconduct), and wholly

inconceivable with regard to the third informational component (felonious nature of misconduct). Therefore, we affirm the district court's decision as to Hill's claim under the Ohio Whistleblower Statute, on the grounds that Hill did not proffer sufficient evidence to create a genuine issue of material fact as to his reasonable and good faith effort to determine the accuracy of the information he repor- ted.

**B. Hill's Wrongful Termination Claim under Federal Whistleblower Statutes**

The district court ruled that Hill did not establish that his conduct qualifies for whistleblower protection under Federal Whistleblower Statutes, because Hill did not file protected information with the federal agencies specified in the statutes until after Defendants terminated his employment, and his "internal whistle-blowing" to Nabors and the Board members does not satisfy statutory requirements. 31 U.S.C. § 5328 protects an employee "or any person acting pursuant to the request of the employee," who files information regarding "a possible violation of any provision of this subchapter or section 1956, 1957, or 1960 of title 18, or any regulation under any such provision," from retaliation by the employer, if the employer is a "financial institution [ ] or nonfinancial trade or business." § 5328(a). 12 U.S.C. § 1831j protects an employee "or any person acting pursuant to the request of the employee," who files information regarding, in the relevant part, "a possible violation of any law or regulation," from retaliation by the employer, if the employer is an "insured depository institution[ ]." § 1831j(a). Both statutes require that information be filed with specific federal agencies: "the Secretary of the Treasury, the Attorney General, or any Federal supervisory agency" in the case of 31 U.S.C. § 5328(a), and "any Federal Banking agency or to the Attorney General" in the case of 12 U.S.C. § 1831j(a). We need not decide whether Mr. Money and First Citizens are covered under either statute: for the sake of argument, we assume, as did the district court, that Defendants are covered by one of the statutes.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

Hill argues that whistle-blower statutes ought to be construed liberally to protect internal whistle-blowing. Hill further argues that he "has not merely rested upon his internal complaints to demand extension of federal whistleblower protection," but also "submitted his complaint to the *961 Federal Reserve through Doski as a conduit, and announced a clear intention to specifically comply with the requirements of the Federal Whistleblower Statutes in his April 5, 2002 letter by filing a SAR."

**10 The district court has adequately addressed Hill's first argument regarding internal whistle-blowing. Hill urged that *all* federal whistleblower statutes should be "broadly construed so as to include internal, or 'intracorporate' whistleblowing, even where the conduct involved did not come under the literal terms of the statute." (quoting *Neal v. Honeywell, Inc.,* 826 F.Supp. 266, 270 (N.D.Ill.1993), *aff'd,* 33 F.3d 860 (7th Cir.1994)). As the district court correctly reasoned, when statutory language of whistleblower provisions is ambiguous and/or broad, courts do tend to construe the language "in favor of protecting the whistleblower." *Hill,* 491 F.Supp.2d at 735 (citing *Haley v. Retsinas,* 138 F.3d 1245, 1250 (8th Cir.1998)). The decisions that Hill relies on to support a liberal construction all interpret other federal whistleblower provisions with different statutory language. *E.g., Neal,* 33 F.3d at 861 (holding that participating in the "investigation for initiation of, testimony for, or assistance in an action filed or to be filed" under the False Claims Act protects whistleblowers even if no formal action was filed); *NLRB v. Scrivener,* 405 U.S. 117, 125, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972) (holding that protection from retaliation for "fil[ing] charges or giv[ing] testimony" under the National Labor Relations Act extends to an employee who gave a written sworn statement to an NLRB examiner); *Kansas Gas & Elec. Co. v. Brock,* 780 F.2d 1505, 1510-12 (10th Cir.1985) (holding that "[assisting or participating in a] proceeding or in any other action" to blow the whistle on the employer included filing internal complaints under the Energy Reorganization Act);

*Jones v. Tennessee Valley Authority,* 948 F.2d 258, 264 (6th Cir.1991) (same).

[2] Judge Frank Easterbrook, while affirming the lower court's decision in *Neal,* pointedly refutes the rule of statutory construction adopted by that lower court and now urged by Hill: "[T]here is no rule that all statutes addressing related topics mean the same thing-let alone that all statutes should receive the reading most favorable to whistleblowers." *Neal,* 33 F.3d at 863. The district court was likewise correct in its refusal to adopt a uniform rule of construction for a variety of different statutes. We agree with the district court's reasoning:

The differences between the language of the above-discussed statutes and the statute at issue here are glaring.... [W]hen the meaning of the statute is unclear from its text, courts tend to construe it broadly, in favor of protecting the whistleblower. *While there is ambiguity in each of the provision[s] that other courts have interpreted to include internal whistle-blowing, section 1831j conspicuously lacks such ambiguity ....* The language of sections 1831j and 5328(a) is clear and unambiguous. If the plaintiff did not report the relevant information, himself or through a conduit, to a federal banking agency, the Attorney General, the Secretary of the Treasury, or any federal supervisory agency, before being discharged or otherwise discriminated against ... then the plaintiff is not protected by these whistle-blower protection laws.

**11 *Hill,* 491 F.Supp.2d at 735-36 (internal quotation marks and citation omitted; emphasis added). Indeed, the Eleventh Circuit has considered the same statutory language of § 1831j(a) now at issue and came *962 to the same conclusion as the district court: an employee's "internal reports are not protected disclosures under § 1831j(a)(1)." *Lippert v. Community Bank, Inc.,* 438 F.3d 1275, 1280 (11th Cir.2006). We uphold the district court's decision to rely on a plain reading of unambiguous statutory language-as did the Eleventh Circuit in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

*Lippert*-rather than to analogize to other courts' broad interpretations of completely different statutory language.

The same considerations militate against Hill's claim that his conduct was protected under the Federal Whistleblower Statutes because Defendants preemptively retaliated, before Hill had a chance to file the information. Hill submits that he is entitled to protection because "he announced a specific intention to comply with federal law and was preemptively terminated." Although the district court did not consider this question explicitly, it is difficult to see why the argument for extending the clear and unambiguous statutory language to cover preemptive retaliation does not fail for the same reason as the argument for extending the same language to cover internal whistle-blowing. The same plain and unambiguous language that excludes internal whistle-blowing also excludes an unrealized intention to blow the whistle. Although Hill "had threatened to file an SAR on more than one occasion, and even announced his intent to do so, [he] did not actually file an SAR until after Defendants fired him." Statutory language is clear that retaliation must *follow* the provision of information to a specified federal authority.

Hill further argues that he in fact complied with the statutory terms permitting the filing of information by "any person acting pursuant to the request of the employee," because he "submitted his complaint to the Federal Reserve through Doski as a conduit." Because Hill did not raise this argument explicitly before the district court, that court did not engage its merits. Hill offers no authoritative support for his contention that his actions constituted a "request" to Doski to make a protected disclosure to the appropriate federal authorities. Hill does not clearly explain how the fact pattern established by the record shows that Hill's letter to the Board of Directors and to Doski constituted a request, and that Doski contacted the Federal Reserve pursuant to that request. However, even if we assume, *arguendo,* that Hill's letter was a valid "request," this

line of argument suffers from two serious flaws: first, the record cannot be read to show that Doski acted "pursuant" to Hill's request. Instead, she acted pursuant to McGookey's request to contact FinCEN, and then pursuant to FinCEN's direction to contact the Federal Reserve. Second, even if we were persuaded that Doski did act pursuant to Hill's request to "provide information [to a specified federal agency] regarding[ ] a possible violation of [a] law or regulation," § 1831j (a)(1), Doski's communication with the Federal Reserve is quite far from the kind of "information" contemplated by the federal statutes. Doski's email to the Federal Reserve was a question regarding whether an SAR must be filed with regard to only one of the allegations made by Hill:

**12 I spoke with a representative from FinCEN this afternoon and he told me to run my question past you. The former president of our finance co. made a loan to an individual with an in-state address, but closed the loan through the mail while she was on assignment in New Jersey. Under FTC law, finance companies must close their loans in house. *963 What ramifications may the finance co. face in this one? There was a question of whether a SAR must be filed....

Doski's question about whether protected information needed to be filed does not amount to actually filing information: she provided no meaningful details on the violator or the violation. For these reasons, we affirm the district court's dismissal of Hill's claim under 31 U.S.C. § 5328 and 12 U.S.C. § 1831j.

**C. Hill's Wrongful Termination Claim under Ohio Public Policy**
Ohio law recognizes a public policy exception to the employment-at-will doctrine. *See Greeley v. Miami Valley Maintenance Contractors, Inc.,* 49 Ohio St.3d 228, 551 N.E.2d 981 (1990); *Painter v. Graley,* 70 Ohio St.3d 377, 639 N.E.2d 51 (1994). In *Collins v. Rizkana,* 73 Ohio St.3d 65, 652 N.E.2d 653, 657-58 (1995), the Ohio Supreme Court set out the elements of the wrongful discharge tort in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

violation of public policy:

   1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).

   2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).

   3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).

   4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

   *See also Kulch v. Structural Fibers, Inc.,* 78 Ohio St.3d 134, 677 N.E.2d 308 (1997). "[T]he clarity and jeopardy elements of the tort of wrongful discharge are questions of law to be determined by the court." *Id.* at 321, citing *Collins,* 652 N.E.2d at 658.[FN2]

      FN2. The remaining two elements are questions of fact. *Kulch,* 677 N.E.2d at 321; *Collins,* 652 N.E.2d at 658.

   The district court dismissed Hill's claim that his termination was in violation of Ohio public policy as set forth in the Ohio Whistleblower Statute, the Federal Whistleblower Statutes, and the "policy of encouraging the reporting of criminal activity." The district court found that because Hill "did not report criminal activity within the corporations to anyone outside of the companies with any authority or oversight over the Defendants' industries until after he was terminated," Hill's actions "do not fulfill the goals of these statutes or of the public policy behind these statutes." *Hill,* 491 F.Supp.2d at 736. Hill contends that the district court erroneously treated this claim as identical with the statutory claims, and that to survive summary judgment Hill has only to "identify a source

of clear public policy and show that the retaliation he suffered jeopardizes the identified public policy."

   **13 [3] Insofar as the asserted public policy is expressed in the Ohio Whistleblower Statute, and insofar as Hill did not comply with that statute's requirements, the district court correctly dismissed Hill's claim. "The obvious implication of *Contreras* is that an employee who fails to strictly comply with the requirements of R.C. 4113.52 cannot base a *Greeley* claim *solely upon the public policy embodied in that statute.* " *Kulch,* 677 N.E.2d at 323 (emphasis added).

   Similar reasoning applies to the clear public policy as expressed in the Federal *964 Whistleblower Statutes. If Hill's claim under either of those statutes fails, then his public policy claim based thereupon must also fail. Courts interpreting Ohio law have held that federal statutes may form a source of a clear public policy for the purposes of the wrongful discharge tort independent of the statutory whistleblower claims, but the kinds of federal statutes at issue were fundamentally different from the Federal Whistleblower Statutes. In particular, in *Kulch* and *Pytlinski v. Brocar Products, Inc.,* 94 Ohio St.3d 77, 760 N.E.2d 385 (2002), the Supreme Court of Ohio upheld the existence of a clear public policy of workplace safety based on the Occupational Safety and Health Act (OSHA) regulations. The Federal Whistleblower Statutes are *not* analogous to OSHA regulations in a crucial respect: OSHA regulations "specifically prohibit[ ] employers from retaliating against employees ... who file OSHA complaints," but they *do not* "provide an employee with a private right of action against the employer." *Kulch,* 677 N.E.2d at 321, citing 29 U.S.C. § 660(c)(1). The Federal Whistleblower Statutes on the other hand, expressly regulate the manner in which actions for retaliation against bank employees are to be pursued, and there is no reason to treat Hill's claim on the basis of policy rooted in these statutes differently from his claim on the basis of policy rooted in the Ohio Whistleblower Statute.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
**(Not Selected for publication in the Federal Reporter)**
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

In other words, where the sole source of the asserted public policy is a whistleblower statute, state or federal, an employee must comply strictly with the dictates of the statute. *See, e.g., Kulch,* 677 N.E.2d at 322-23 ("By imposing strict and detailed requirements on certain whistleblowers and restricting the statute's applicability to a narrow set of circumstances, the legislature clearly intended to encourage whistleblowing only to the extent that the employee complies with the [statutory] dictates.")

Hill claims that his termination violated clear public policies beyond those embodied in the Ohio and Federal Whistleblower Statutes: in particular, he cites the "clear public policy in favor of reporting crimes," the policy in favor of "reporting possible criminal conduct of another employee," as well as the "clear public policy prohibiting dismissal of bank employees in retaliation for reporting unlawful conduct by the officers of financial institutions." The district court does not expound at length on these claims, but it is evident that its dismissal rests on its prior holding that there is no genuine material issue as to whether Hill *reported* anything outside the company-and as we agreed above, he did not. Hill's conduct did not fulfill the goals of the identified public policies, not solely because Hill did not comply with statutory requirements, but also because Hill failed to *report,* as required by the clear public policies he identified.

**\*\*14** Holding that a public policy in favor of *reporting* crimes requires that a possible crime actually be reported is not at odds with lower court decisions Hill cites in support of his claim. Hill advances two propositions: first, that there is a clear public policy in favor of reporting crimes, and second, that a claim under this policy does not require "reporting to an outside agency." Hill relies on two distinct sets of cases to support these two propositions. However, the cases Hill identifies to support the second proposition do not involve the same clear public policy at issue here; in particular, *all* of these cases deal with the *policy favoring workplace safety. E.g., Pytlinski,* 94 Ohio St.3d 77,

760 N.E.2d 385 (no filing of a complaint with \***965** a specific entity required to sustain a *Greeley* claim in violation of the public policy favoring workplace safety); *Dohme v. Eurand Am., Inc.,* 170 Ohio App.3d 593, 868 N.E.2d 701 (Ohio Ct.App.2007) (same); *Miller v. MedCentral Health System, Inc.,* 2006-Ohio-63, 2006 WL 44290, 2006 Ohio App. LEXIS 51 (Ohio Ct.App.2006) (unreported) (no report to a specific entity required to sustain a *Greeley* claim in violation of the public policy favoring the safekeeping of food and workplace safety). Hill does not assert that his conduct furthered the public policies in favor of workplace safety (or safekeeping of food); therefore, these decisions are inapposite.

Crucially, the plaintiffs who did state a valid cause of action under *Greeley* in the set of cases Hill identifies to support his first proposition, the existence of a clear public policy in favor of reporting crimes, all fulfilled the requirement to *report* alleged crimes. *Dunnigan v. City of Lorain,* 2002-Ohio-5548, 2002 WL 31313216, 2002 Ohio App. LEXIS 5563 (Ohio Ct.App.2002) (an employee discharged for *reporting an alleged crime to the police* stated a valid *Greeley* claim in violation of the public policy favoring reporting crimes); *Bailey v. Priyanka Inc.,* 2001-Ohio-1410, 2001 WL 1192731, 2001 Ohio App. LEXIS 4558 (Ohio Ct.App.2001) (same). Therefore, there is no relevant legal authority to support his contention that external reporting is not required to sustain a *Greeley* claim for wrongful discharge in violation of a clear public policy to *report* crimes.

Hill asserts the existence of another clear public policy "prohibiting dismissal of bank employees in retaliation for reporting unlawful conduct by the officers of financial institutions," but does not clearly identify which specific "state or federal constitution, statute or administrative regulation" manifests that policy. Hill lists a number of state and federal laws that he characterizes as "sources of public policy"-namely, "the Ohio Mortgage Loan Act, 18 U.S.C. § 656 (Theft, Embezzlement, or

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

Misapplication by bank employee), 18 U.S.C. § 1005 (Fraud and False Statements), 18 U.S.C. § 1344 (Mail Fraud-Bank Fraud), 18 U.S.C. § 1342 (Mail Fraud-Fictitious Name or Address)," the Ohio Whistleblower Statute, and the Federal Whistleblower Statutes. However, Hill does not match the "source" to the clear policy: we are left guessing as to which of these numerous statutes manifests a clear public policy against the "dismissal of bank employees in retaliation for reporting unlawful conduct by the officers of financial institutions," let alone what specific statutory language expresses said policy clearly. Even if such a policy were clearly manifest, this claim fails for the same reasons as above-there was no "reporting" of violations to external authorities. Since Hill did not establish the clarity element of the tort, whether he has established the jeopardy element is moot. For these reasons, we affirm the district court's dismissal of Hill's wrongful discharge claim in violation of Ohio public policy.

### III
#### A. Defendants' Claim for Sanctions on the Basis of Frivolous Conduct

**\*\*15** The Defendants present five distinct questions of law raised by the district court's decision to grant Hill's motion to dismiss defendants' counterclaim. However, the essence of the issue presented on appeal may be economically boiled down to one. Defendants protest that the district court ignored the basis for their counterclaim\*966 in both state and federal law (under Ohio Civil Rule 11, Ohio Rev.Code § 2323.51 and Fed. Civ. R. 11, respectively), by "[a]ssuming for the sake of argument that the Ohio statutes are applicable in federal court...." However, if Hill's claims were not frivolous as a matter of law, the particular rule violated by the allegedly frivolous conduct matters very little. Absence of frivolous conduct as a matter of law defeats Defendants' counterclaim under any theory, since Defendants claim relief under Ohio Civil Rule 11, Ohio Rev.Code § 2323.51 and/or Fed.R.Civ.P. 11 for the same allegedly frivolous conduct.

The frivolous conduct alleged by Defendants amounts to the following. First, Hill, together with his counsel, contrived a situation in an attempt to create a whistleblower claim. Second, Hill engaged in forum shopping, by pursuing "virtually identical actions ... in state court, then federal court, then state court, and then again in federal court...." Third, Hill's claims against First Citizens were frivolous, because Hill was never an employee of First Citizens.

The district court's holding that "frivolous conduct has not been sufficiently established" properly applies to each one of the three allegations. Defendants did not demonstrate any set of facts consistent with their counterclaim under which they would be entitled to relief. Defendants' first contention, that Hill and his counsel "contrived a situation in an attempt to create a whistleblower claim" rests on the claim that Hill must have had the assistance of legal counsel in composing his April 5, 2002 letter to the Board of Directors, because the letter was "typed on a word processor at the offices of his legal counsel." Taking these allegations as true, Hill's foreseeing that he would be terminated and seeking legal counsel prior to termination does not render his whistleblower claim frivolous. Likewise, multiple filings and an improper designation of First Citizens as a defendant are not obviously and unquestionably frivolous.

[4] Federal Rule of Civil Procedure 11 "affords the district court the discretion to award sanctions when a party submits to the court pleadings, motions or papers that are presented for an improper purpose, are not warranted by existing law or a non-frivolous extension of the law, or if the allegations and factual contentions do not have evidentiary support." *First Bank of Marietta v. Hartford Underwriters Ins. Co.,* 307 F.3d 501, 510 (6th Cir.2002) (citing Fed.R.Civ.P. 11(b)(1)-(3)). Although the district court did not consider the imposition of Rule 11 sanctions explicitly, it cannot be said that the conduct identified by Defendants obviously signals the presence of an improper purpose

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))
(Not Selected for publication in the Federal Reporter)
(Cite as: 309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio)))

behind any pleading, motion or paper. Nor can it be said that Hill's conduct clearly entailed submitting to a court any pleadings, motions or papers that are unwarranted by a non-frivolous extension of the law. On the contrary, the district court was correct in determining that the issues presented implicate important substantive questions of law. Finally, although Hill did not prevail on any of his claims, his failure to survive summary judgment is not decisive evidence that his allegations were wholly unsupported by evidence: indeed, both parties have expended much effort on arguments of substantive law. Moreover, we have previously held that "the imposition of sanctions for violations [is] discretionary, rather than mandatory." *Ridder v. City of Springfield,* 109 F.3d 288, 293 (6th Cir.1997). Even if the conduct*967 Defendants allege is frivolous, and thus *may* be sanctionable under Ohio or federal rules, the conduct is not so egregious so as to *require* an imposition of discretionary sanctions.

**16 Finally, Defendants raise on appeal a new ground for imposing sanctions, the court's exercise of its inherent powers. This court has affirmed the district court's inherent authority to impose sanctions, even if the sanctionable conduct is not a violation of any rule. *E.g., First Bank of Marietta,* 307 F.3d at 512. As the Supreme Court explained:

> [A] court may assess attorney's fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order [ ]".

*Ibid.,* quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (citations omitted). The alleged frivolity is certainly not the kind of conduct that "defile[s]" "the very temple of justice." *Ibid.* Thus, we affirm the district court's dismissal of the Defendants' counterclaim.

IV

For the reasons set out above, we AFFIRM the district court's grant of summary judgment in favor of Defendants, and the grant of judgment on the pleadings in favor of Hill.

C.A.6 (Ohio),2009.
Hill v. Mr. Money Finance Co. & First Citizens Banc Corp.
309 Fed.Appx. 950, 2009 WL 279086 (C.A.6 (Ohio))

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.