RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0095p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT
_____

BRIAN SEXTON,

     *Plaintiff-Appellant*,

  v.

     No. 13-1604

PANEL PROCESSING, INC. and PANEL PROCESSING OF
COLDWATER, INC.,

     *Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:12-cv-10946—Thomas L. Ludington, District Judge.

Argued:  January 28, 2014

Decided and Filed:  May 9, 2014

BEFORE: SUTTON, McKEAGUE and WHITE, Circuit Judges.
_____

#### COUNSEL

**ARGUED:**  William A. Pfeifer, ISACKSON, WALLACE & PFEIFER, P.C., Alpena, Michigan, for Appellant.  Donald H. Scharg, BODMAN PLC, Troy, Michigan, for Appellees.  Stephen A. Silverman, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae.  **ON BRIEF:**  William A. Pfeifer, ISACKSON, WALLACE & PFEIFER, P.C., Alpena, Michigan, for Appellant.  Donald H. Scharg, Steven J. Fishman, David A. Malinowski, BODMAN PLC, Troy, Michigan, for Appellees.  Stephen A. Silverman, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae.

   SUTTON, J., delivered the opinion of the court, in which McKEAGUE, J., concurred. WHITE, J. (pp. 16–29), delivered a separate dissenting opinion.

––––––––––––––––––

## OPINION

––––––––––––––––––

SUTTON, Circuit Judge.   The Employee Retirement Income Security Act prohibits an employer from retaliating against an employee "because he has given information or has testified or is about to testify in any inquiry or proceeding relating to [the Act]."  29 U.S.C. § 1140. When Brian Sexton made a one-time unsolicited complaint to his employer about alleged violations of the Act, did that amount to "giv[ing] information . . . in any inquiry?"  We think not and hence affirm.

### I.

Panel Processing makes floor panels.  Brian Sexton worked as a general manager in its facility in Coldwater, Michigan, and served as a trustee for the company's employee retirement plan.   In 2011, Sexton and another trustee, Robert Karsten, campaigned on behalf of two employees running for the company's board of directors.   The employees won the election, but the board refused to seat them on the ground that it would violate the company's bylaws, which limited the number of inside directors.   At the same time, the board removed Sexton and Karsten as trustees of the retirement plan.

Two days later, Sexton emailed the chairman of the board:

> I believe that your actions . . . in refusing to seat [the employees] as directors of the company and removing Rob Karsten and me as Trustees of the [retirement plan] are violations of ERISA and the Michigan Corporations Business Act and other state and federal laws.  I plan to bring these violations to the attention of the U.S. Department of Labor and Michigan Department of Licensing and Regulatory Affairs unless they are immediately remedied.

R. 9-13 at 2.  Neither the chairman nor anyone else responded to the email, and Sexton took no further action.   About six months later, the company fired Sexton from his job as a general manager.

No. 13-1604        *Sexton v. Panel Processing, Inc. et al.*                Page 3

Sexton sued the company in Michigan state court for violating the State's Whistleblower Protection Act and for breaching his employment contract. One might think that, when a Michigan plaintiff sues a Michigan defendant under Michigan law in a Michigan court, the case would stay there. But the company invoked complete preemption, a doctrine that converts state law claims "within the scope of [ERISA's] civil enforcement provisions" into federal claims. *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66 (1987). Under this banner, the company recharacterized Sexton's state whistleblower claim as an ERISA claim. *See* 29 U.S.C. § 1140. It then removed the transfigured lawsuit to federal court.

Once in federal court, Sexton did not challenge the company's removal of the case or its use of complete preemption. Sexton and Panel Processing instead litigated the case as though Sexton had raised a claim under ERISA. The district court granted summary judgment to the company on this ERISA claim, and it declined supplemental jurisdiction over Sexton's breach-of-contract claim.

## II.

On appeal, Sexton does not contest the district court's application of complete preemption to Sexton's claim or otherwise attempt to resurrect his claim under Michigan's Whistleblower Protection Act. Under our case law, true enough, the doctrine of complete preemption goes to the subject matter jurisdiction of the court. *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 565 (6th Cir. 2007) (en banc). But we are satisfied, just as the parties and the district court were satisfied, that the company properly invoked the doctrine here.

## III.

Sexton (supported by the Secretary of Labor) instead takes aim at the district court's rejection of his claim under ERISA. The relevant law says in relevant part: "It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to [the Act]." 29 U.S.C. § 1140. Both parties take as a given (for now) that the company fired Sexton because of his email to the chairman of the board.

All matters of interpretation begin with text; some end there.  The text of this provision takes us well down the way of ending this dispute.  No one claims that Sexton sent the email in the context of a "proceeding."  And no one claims that the email amounted to testimony—that he "testified" or was "about to testify" in an "inquiry" or "proceeding" by sending the email.  That leaves the possibility that the email amounted to "giv[ing] information . . . in any inquiry."  We have no problem with the idea that, by sending the email, Sexton was "giv[ing] information." But, as Sexton and the Secretary concede, the statute demands not just the limitless "giv[ing]" of "information."  It requires that the information be given in an "inquiry"—"any" inquiry, to be sure, but an inquiry all the same.  "Inquiry" might mean an official investigation, as in "Earl Warren led an inquiry into the assassination of President Kennedy."  Or it might mean a question or a request for information, as in "The advocate answered the judge's inquiry."  *See* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 317 (2d ed. 1995).  We need not decide whether § 1140 uses "inquiry" in the former sense, in the latter sense, or in both senses.  Under either definition, no inquiry occurred.  Sexton did not send the email in connection with an official investigation.  And he did not send the email in response to a question or request for information. Even what we might call a nunc pro tunc theory of "giv[ing] information . . . in any inquiry" would not aid Sexton.  For even after he sent the email, no one asked him any questions about the subject of the email, and no investigation involving him ever occurred.  As the text of the email confirms, this was nothing more than a complaint accompanied by a threat:  Sexton demanded that the company change course and threatened action if it did not.  The email neither asks nor answers a question.  That is not "giv[ing] information . . . in any inquiry."

This interpretation not only respects the meaning—indeed accounts for the broadest possible meaning—of these terms, but it also respects the different ways Congress has dealt with retaliation in the work place.  Congress has enacted roughly forty anti-retaliation laws, *see* Jon O. Shimabukuro et al., Cong. Research Serv., R43045, *Survey of Federal Whistleblower and Anti-Retaliation Laws* (2013), and they tend to include two distinct types of prohibitions.  The first protects employees who oppose, report or complain about unlawful practices.  *See, e.g.*, 29 U.S.C. § 218c(a) (Consumer Financial Protection Act) ("provided . . . information relating to any violation"); *id.* § 215(a) (Fair Labor Standards Act) ("filed any complaint"); 42 U.S.C. § 2000e-3(a) (Title VII) ("opposed any . . . unlawful employment practice").  The second

protects employees who participate, testify or give information in inquiries, investigations, proceedings or hearings. *See, e.g.*, 29 U.S.C. § 218c(a) (Patient Protection and Affordable Care Act) ("assisted or participated . . . in . . . a proceeding"); *id.* § 2615(b) (Family and Medical Leave Act) ("given . . . any information in connection with any inquiry or proceeding"); 42 U.S.C. § 12203(a) (Americans with Disabilities Act) ("participated in any manner in an investigation, proceeding, or hearing").

Most anti-retaliation laws include both types of clauses. *See, e.g.*, 6 U.S.C. § 1142(a) (National Transit Systems Security Act); 7 U.S.C. § 26 (Commodity Exchange Act); 15 U.S.C. § 78-u6(h)(1)(A) (Securities Exchange Act); *id.* § 2087(a) (Consumer Product Safety Act); 29 U.S.C. § 215(a) (Fair Labor Standards Act); *id.* § 218c(a) (Patient Protection and Affordable Care Act); *id.* § 623(d) (Age Discrimination in Employment Act); *id.* § 660(c)(1) (Occupational Safety and Health Act); *id.* § 2615(b) (Family and Medical Leave Act); 30 U.S.C. § 815(c) (Federal Mine Safety and Health Act); 42 U.S.C. § 12203(a) (Americans with Disabilities Act); 42 U.S.C. § 2000e-3(a) (Title VII); 49 U.S.C. § 31105(a) (Commercial Motor Vehicle Safety Act); *id.* § 60129(a) (Pipeline Safety Improvement Act). Many of these laws were in existence before 1974, when Congress enacted ERISA. *See* the Age Discrimination in Employment Act, the Fair Labor Standards Act, the Occupational Safety and Health Act, and Title VII.

By contrast, a few laws include only the first type of clause, the sort that protects employees who report unlawful practices. *See, e.g.*, 15 U.S.C. § 2651 (Asbestos Hazard Emergency Response Act); 46 U.S.C. § 80507(a) (International Safe Container Act). And a few laws include only the second type of clause, the sort that protects employees who participate in inquiries, proceedings or hearings. *See, e.g.*, 33 U.S.C. § 948a (Longshore and Harbor Workers' Compensation Act); 42 U.S.C. § 7622(a) (Clean Air Act).

In enacting this provision of ERISA, Congress included only a clause protecting people who give information or testify in inquiries or proceedings. Unlike most of the other laws just cited, ERISA thus does not contain a clause protecting people who oppose, report or complain about unlawful practices. "[W]here words differ as they differ here, Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). A contrary interpretation would parody the presumption against

redundancy.  *See Maracich v. Spears*, 133 S. Ct. 2191, 2205 (2013).   If clauses protecting involvement in investigations automatically protect even complaints outside investigations, dozens of opposing/reporting/complaining clauses across the United States Code would serve no purpose.

Sexton, the Secretary and the dissent insist that § 1140 covers an employee's complaints to his employer about violations of the Act, no matter whether the employee speaks during an investigation or in response to an inquiry.  Yet this argument spurns both plausible meanings of "inquiry," whether the narrow one (an investigation) or the broader one (a question).  This interpretation instead reads "in any inquiry or proceeding relating to [the Act]" out of the statute.  Only then will the law protect every complaint about a violation of the Act, regardless of when and where the employee makes it.   Accepting Sexton's invitation thus means rejecting a foundational principle of interpretation:  "It cannot be presumed that any clause in [a legal text] is intended to be without effect; and therefore such a construction is inadmissible, unless the words require it."  *Marbury v. Madison*, 1 Cranch 137, 174 (1803).

Subtracting words from the law is bad enough, but Sexton's theory also requires us to add words in their place.  As written, § 1140 does not distinguish reports of unlawful practices from other statements.  The law covers *any* information or testimony, so long as it is given in an inquiry or proceeding relating to the Act.  The law protects not only the witness who testifies in a criminal prosecution that corporate executives defrauded employees of their pensions, but it also protects the witness who testifies at a benefits hearing that an employee has a disability.  By proposing a special rule for ERISA-related complaints, Sexton and the Secretary draw a distinction between information about violations of the Act and other information—a distinction found nowhere in the statute.

Sexton and the Secretary propose a textual detour around these problems:  Because "complaining" sometimes means "challenging," "challenging" sometimes means "questioning," and "questioning" sometimes means "inquiring," it follows that a complaint is an inquiry.  But this line of reasoning could transform all manner of things into inquiries—everything from the Peloponnesian War (the Spartans challenged, hence questioned, Athenian supremacy) to the Boston Tea Party (the protesters challenged, hence questioned, British taxes).   And it could

transform complaints into all manner of things—everything from a whisper (complaining means grumbling, grumbling means murmuring, murmuring means whispering) to a shout (complaining means bewailing, bewailing means crying, crying means shouting).  Not unlike the children's game of telephone, this approach risks converting the ultimate message into something quite different from the original message—indeed sometimes into the opposite message.  An approach to interpretation that exponentially blurs meaning is not apt to help in the fair interpretation of statutes.  In the end, the overlap between "complain" and one meaning of "question" and the overlap between a different meaning of "question" and "inquiry" do not transform "complain" into "inquiry."

Sexton persists that it would be strange for the law to protect an employee who reports a violation when asked a question in the context of an inquiry or proceeding but not an employee who reports a violation on his own initiative.  Yet this result looks strange only if one assumes that Congress passed § 1140 in order to protect people who disclosed violations of the Act.  If one instead starts with the premise that Congress passed § 1140 to prevent interference with inquiries and proceedings, the distinction between statements made in an inquiry and statements made outside an inquiry makes sense.  As shown, Congress opted to protect employees in many ways in the context of investigations and unprompted complaints, some that may appear underinclusive and some that may appear overinclusive.  When Congress picks one approach or the other in a given statute, that does not give a court license to rewrite the law—here by crossing "in any inquiry or proceeding" out of § 1140.  Denying this point means condemning as absurd dozens of federal anti-retaliation clauses that limit their attention to inquiries, proceedings or investigations.

The Secretary offers a variation on this theme.  Section 1140, he says, at least protects an employee whose complaint prompts an investigation, because giving information that leads to an inquiry counts as giving information "in" that inquiry.  And it would be odd, he adds, for the law to deny an employee protection from retaliation merely because the employer later chooses not to conduct an investigation—meaning that § 1140 must cover *all* complaints, whether prompted by an inquiry or not.  The first problem with this argument is that a disclosure that prompts an inquiry does not occur "in" that later inquiry.  Deep Throat's disclosures led to a congressional

investigation of Watergate, but one would not say that Deep Throat gave information in Senator Ervin's inquiry.   Otherwise, all disclosures or complaints would occur "in" an inquiry or proceeding, so long as the employee subsequently filed a lawsuit—the later "proceeding" or "inquiry" in which the disclosure would occur.   The second problem with this argument is that, even if we could bend the statute this far, we could bend it no farther.   Saying that § 1140 covers complaints that lead to an inquiry at least leaves some role for the phrase "in any inquiry or proceeding."   Saying that it covers all complaints whatsoever—even when no inquiry results, as in this case—erases words from the statute.

The risk of unusual results, moreover, would not disappear even if we adopted the theory offered by Sexton and the Secretary.   The law as written contains a sensible limitation on the information that enjoys federal protection:  The information must be conveyed "in any inquiry or proceeding relating to [the Act]."   Erasing that limit leaves a law that protects anyone who has "given information"—a boundless phrase that covers everything from giving tax advice to giving score updates on a World Cup soccer match.   We could try to overcome this problem by limiting our reconfigured statute's coverage to information that relates to the Act.   But that does not help much, because a law protecting anyone who has "given information relating to the Act" would still protect the professor denied tenure because all of his law review articles concern ERISA. We could try to sidestep this problem too by limiting our doubly reconfigured statute's coverage to disclosures about violations of the Act.   But this takes us too far in the opposite direction, because now we have taken away federal protection from the witness who testifies at a benefits hearing about an employee's disability.   All of these problems disappear if we honor the boundaries that the statute already contains.

Sexton and the Secretary argue that their interpretation advances § 1140's purpose of protecting whistleblowers from retaliation.   One might quibble with Sexton's self-portrait as a whistleblower:  He did not disclose violations of the law to the public or to the authorities but threatened to sue his employer unless it did as he demanded.   But even on its own terms, this argument falls short.   A court must discern the purpose of a law "chiefly from its words," *Sturges v. Crowinshield*, 4 Wheat. 122, 202 (1819), and the words of this law—particularly when examined in the context of other federal anti-retaliation laws—do not show that Congress meant

to protect whistleblowers in the abstract.  Section 1140 does not single out information about violations of the law; it covers information of any genre.  The claim that Congress passed § 1140 to protect people who complain about violations of the law rests on nothing more than Sexton and the Secretary's say-so.

Keep in mind, moreover, that Congress may have enacted this provision not so much to protect the jobs of whistleblowers as to protect the integrity of inquiries.  Section 1140's reference to "inquir[ies] or proceeding[s]" suggests that Congress had the latter objective in mind.  We have attributed a similar purpose to a similar clause in another anti-retaliation law.  *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (discussing Title VII's participation clause).  A sense of how ERISA works shows why Congress would pursue that objective here.  The Act requires retirement plans to provide for administrative review of employees' claims.  *See* 29 U.S.C. § 1133.  Employees must usually exhaust internal remedies before heading to federal court, *see Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991), and courts often must defer to decisions made during the internal review process, *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989).  Given the centrality of hearings to the administration of retirement plans, one would *expect* Congress to protect these and other inquiries and proceedings.  Instead of supporting Sexton's claim, this understanding of congressional purpose defeats it.

Turning to the Congressional Record, the Secretary unearths a snippet of Senate debate that (he claims) analogizes ERISA's prohibition against retaliation to Title VII's prohibition.  The relevant statement explains that § 1140 "would provide a remedy for any person fired such as is provided for a person discriminated against because of race or sex." 119 Cong. Rec. 30044 (1973).  The Secretary infers that, because Title VII protects complaints, so too does § 1140.  But he overlooks the reality that Title VII includes both an *opposition* clause and a *participation* clause.  Read alongside the text of § 1140, the legislative history at most shows that the drafter modeled § 1140's language about inquiries on the participation clause, not the opposition clause.  That does nothing to advance Sexton's claim, because Title VII's participation clause does not protect unsolicited complaints.  Abstract appeals to purpose and legislative history at any rate have little value in interpreting a "precise and reticulated" statute, *Carter v. Welles-Bowen*

*Realty, Inc.*, 736 F.3d 722, 729 (6th Cir. 2013), a description that fits ERISA to a tee.  In ERISA, of all statutes, we should hesitate to add a provision the statute does not contain (a clause protecting any employee who opposes allegedly unlawful practices) and to eliminate a limitation that the statute does contain ("in any inquiry or proceeding").

Shifting from purpose to policy, Sexton and the Secretary claim that their interpretation encourages employees to report violations to their employers, and that enforcement of the Act depends on such reports.  This last claim is debatable.  The Act already requires an employer to keep records and file reports about retirement plans, 29 U.S.C. § 1059, and backs up these requirements with criminal penalties, *id.* § 1131(a).  Also debatable is whether the benefits of a broader anti-retaliation rule (more reporting) outweigh the costs (more litigation and a greater likelihood that employers will refrain from even legitimate discharges for fear of getting sued).  The prospect of improved enforcement at any rate does not by itself allow us to add new liabilities to a statute.  *Cf. Alexander v. Sandoval*, 532 U.S. 275 (2001); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).

Moving on to precedent, Sexton and the Secretary argue that case law requires an expansive interpretation of federal anti-retaliation laws and undercuts our focus on the text.  Not so.  When faced with "clear language," the Supreme Court recently explained—in a retaliation case no less—a court may not "conclude that what Congress omitted from the statute is nevertheless within its scope."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).  That is this case.

Nor does *Kasten v. Saint-Gobain Performance Plastics Corp.* change things.  131 S. Ct. 1325 (2011).  The Fair Labor Standards Act prohibits discharging an employee because he has "filed any complaint" alleging a violation of the Act, 29 U.S.C. § 215(a)(3), and the Court had to decide whether this provision covered oral as well as written complaints.  The Court examined dictionaries, then legislation, regulations and judicial opinions using the word "file," then other appearances of "file" in the Fair Labor Standards Act, then the texts of other anti-retaliation provisions.  131 S. Ct. at 1331–33.  Only because these indicators of meaning failed to yield a "conclusive answer" did the Court turn to "functional considerations," such as the importance of

oral complaints to the law's administration.  *Id.* at 1333–34.  Far from licensing free-form interpretation of anti-retaliation laws, *Kasten* confirms the primacy of the statutory text.

*Crawford v. Metropolitan Government of Nashville* is of a piece.  555 U.S. 271 (2009).  It held that Title VII's *opposition* clause protects employees who oppose unlawful practices, regardless of whether they speak on their own initiative or in response to employer questions.  The result does not help Sexton, because (unlike the law invoked in this case) Title VII's opposition clause does not distinguish inquiries and proceedings from other settings.  Nor does the reasoning help him, because *Crawford* turned on the "ordinary meaning" of the opposition clause, *id.* at 276, not on any special interpretive rule for anti-retaliation statutes.  The dissent for its part takes up *Crawford*'s observation that "nothing in [Title VII's opposition clause] requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the words when her boss asks a question."  *Id.* at 277–78.  The dissent reasons that it makes no sense to distinguish complaints made during questioning from complaints made without questioning, prompting the conclusion that § 1140 protects all complaints whatsoever.  But the conclusion does not follow from the premise.  The dissent overlooks another possibility, one that both avoids odd results *and* stays within the words of the text:  Interpret "inquiry" to mean "formal investigation" rather than "question."  That indeed is what the Fourth Circuit does.  *See King v. Marriott Int'l, Inc.*, 337 F.3d 421, 427 (4th Cir. 2003).

Sexton, the Secretary and the dissent also cast about for support in our circuit's precedents.  The decisions they reel in, *see, e.g.*, *EEOC v. Ohio Edison Co.*, 7 F.3d 541 (6th Cir. 1993); *EEOC v. Romeo Cmty. Sch.*, 976 F.2d 985 (6th Cir. 1992), do not help them.  Each case interprets a statute that already contains an opposition clause to protect a form of opposition.  None authorizes a court to create an opposition clause out of nothing.

The same is true of out-of-circuit decisions.  Every relevant *holding* hurts Sexton's position.  The Third and Fourth Circuits have both held that § 1140 does not cover complaints like Sexton's.  *See Edwards v. A.H. Cornell & Son*, 610 F.3d 217, 225–26 (3d Cir. 2010) (concluding that "unsolicited internal complaints are not protected under [§ 1140] based on a plain reading of that provision's terms"); *King v. Marriott Int'l, Inc.*, 337 F.3d 421, 428 (4th Cir.

2003) (concluding that "the most compelling interpretation of the statutory language" excludes workplace complaints).  The Second Circuit has reasoned the same way.  *Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325, 329 (2d Cir. 2005) (per curiam) (reasoning that § 1140 covers a complaint only if the employee made it in response to a "request for information").

As for Sexton's citation of cases from the Fifth, Seventh and Ninth Circuits, they offer less than advertised.  In the case from the Fifth Circuit, an employee sued his employer under state law for wrongful discharge, alleging that it fired him for refusing to carry out orders violating ERISA.  *Anderson v. Elec. Data Sys. Corp.*, 11 F.3d 1311 (5th Cir. 1994).  The Fifth Circuit held that federal law preempts this state claim—a holding that has nothing to do with the present debate.  The court observed along the way, to be sure, that § 1140 "addresses . . . discharges for providing information or testimony relating to ERISA."  *Id.* at 1314.  But the court immediately added a footnote that quoted § 1140 in full.  *Id.* at 1314 n.2.  The Fifth Circuit's passing remark amounts to a shorthand description of § 1140, not a holding (or for that matter even a considered dictum) that § 1140 covers every complaint about a violation, even complaints delinked from an inquiry or proceeding.

The Ninth Circuit's decision follows a similar pattern.  *Hashimoto v. Bank of Hawaii*, 999 F.2d 408, 411 (9th Cir. 1993).  An employee sued her employer under a state whistleblower law, alleging that it fired her for complaining about violations of ERISA.  The Ninth Circuit held that the doctrine of complete preemption converted the state claim into a federal ERISA claim.  *Id.* at 409.  This holding does not cover the issue at hand, which concerns the validity of a claim under federal law, not the propriety of recharacterizing a state claim as a federal one.  Sexton and the Secretary persist that, according to the Ninth Circuit's opinion, § 1140 "may be fairly construed to protect a person . . . fired because she was protesting a violation of law in connection with an ERISA plan."  *Id.* at 411.  But this statement was likely dictum.  Even if it were a holding, this drive-by construction of the law—hinged on the self-fulfilling prophecy that "[t]his statute is clearly meant to protect whistle blowers," *id.* at 411, and unhinged from the text of the provision—is not convincing.

That leaves the Seventh Circuit.  It held that § 1140 covers any complaint about the Act that either asks or answers a question.  *George v. Junior Achievement of Cent. Ind., Inc.*,

694 F.3d 812, 817 (7th Cir. 2012).  But that decision does not help Sexton because his email did neither.

According to the dissent, the Fifth, Seventh and Ninth Circuit decisions prove at least that § 1140 contains an ambiguity sufficient to trigger *Chevron* deference and sufficient to require a liberal interpretation in favor of the employee.  But as shown below and as the Secretary concedes, this case does not involve *Chevron*.  And as just shown, the Ninth Circuit did not *hold* that § 1140 protects people like Sexton, and the Fifth and Seventh Circuits did not even suggest it.  None of these circuits, moreover, evaluated § 1140 against the backdrop of other federal anti-retaliation laws.  Not one of them acknowledges the distinction these laws make between opposition and participation clauses, and not one of them explains why § 1140 should protect all opposition to unlawful practices even though its text mentions only some participation in inquiries and proceedings.  No less importantly, disagreements between judges at most suggest ambiguity.  They do not prove it.  If they did, the agency would win every circuit split about whether a federal law authorizes its regulation, *but see, e.g.*, *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002) (agency loses); the State would win every circuit split about whether a federal law preempts its statute, *but see, e.g.*, *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422 (2014) (State loses); and the criminal defendant would win every circuit split about whether a federal law punishes his conduct, *but see, e.g.*, *United States v. Castleman*, 134 S. Ct. 1405 (2014) (criminal defendant loses).

The Secretary urges us to defer to his interpretation of the statute.  He (correctly) does not claim deference under *Chevron v. Natural Resources Defense Council*, which requires courts to accept an agency's reasonable interpretation of a statute that the agency administers.  467 U.S. 837 (1984).  The Act does not give the Secretary any authority to administer § 1140, instead contemplating enforcement through private causes of action.  *Chevron* has no place where Congress entrusts enforcement of a statute to the courts rather than to an agency.  *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649–50 (1990).  The Secretary's interpretation, moreover, appears not in a regulation but in a friend-of-the-court brief filed in this case and in similar briefs filed in other circuits.  Briefs do not receive *Chevron* deference.  *United States v. Mead Corp.*, 533 U.S. 218, 238 n.19 (2001).  All of this explains why the Secretary appeals instead to *Skidmore v. Swift*

*& Co.*, which entitles an agency's views to respect proportionate to its persuasive power. 323 U.S. 134, 140 (1944). As shown, we find the Secretary's arguments unpersuasive.

For what it is worth, our decision has few if any consequences beyond this Act. Most federal statutes that prohibit retaliation, like Title VII and the Fair Labor Standards Act, *do* include separate clauses protecting employees who complain about or oppose unlawful practices. 29 U.S.C. § 215(a); 42 U.S.C. § 2000e-3(a). Congress chose not to include a similar clause in ERISA, and we should respect that choice.

For these reasons, we affirm.

# APPENDIX

## 29 U.S.C. § 1140.  Interference with protected rights

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.  It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter or the Welfare and Pension Plans Disclosure Act.  In the case of a multiemployer plan, it shall be unlawful for the plan sponsor or any other person to discriminate against any contributing employer for exercising rights under this chapter or for giving information or testifying in any inquiry or proceeding relating to this chapter before Congress.  The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

―――――――――――

**DISSENT**

―――――――――――

HELENE N. WHITE, Circuit Judge (dissenting).  I respectfully dissent.

The question whether section 510 protects unsolicited employee complaints has split the circuits.  The Fifth, Seventh, and Ninth Circuits have interpreted § 510 to protect an employee's "unsolicited internal complaint."  In contrast, the Second, Third, and Fourth Circuits have interpreted § 510 as only protecting employees when the employer asks the first question/initiates the inquiry.

I do not agree that § 510's "plain meaning" is easily ascertained; nor do I agree that the Supreme Court's most recent guidance in interpreting anti-retaliation provisions, *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325 (2011), is inapposite here.  I would follow the most recent circuit court opinion on point, *George v. Junior Achievement of Central Indiana, Inc.*, 694 F.3d 812 (7th Cir. 2012).  There, the Seventh Circuit observed that § 510 "is a mess of unpunctuated conjunctions and prepositions.  Although the district court concluded that the language is unambiguous, it is anything but."  *Id.* at 814 (internal citations omitted).  *George*, the only post-*Kasten* circuit court decision, applied *Kasten*'s interpretive guidance, observing that that the term "inquiry" "sometimes means nothing more than a question," and that § 510 protects unsolicited internal employee grievances regardless whether the employer or employee initiated the "inquiry."  *Id.* at 815, 817.

### I. Supreme Court Guidance on the Interpretation of Anti-Retaliation Provisions — *Kasten* (2011) and *Crawford* (2009)

Two relatively recent Supreme Court decisions construed anti-retaliation provisions, *Kasten*, and *Crawford v. Metropolitan Government of Nashville & Davidson County, Tennessee*, 555 U.S. 271 (2009) (reversing the Sixth Circuit).  Neither involved § 510 of ERISA, but both demonstrate the trend of the Court to interpret anti-retaliation provisions to afford broad protection of employees.

## A.  *Crawford*'s Interpretation of Title VII

The *Crawford* Court interpreted Title VII s opposition clause, 42 U.S.C. § 2000e-3(a), which makes it "unlawful . . . for an employer to discriminate against any . . . employe[e] . . . because he has opposed any practice made . . . unlawful . . . by this subchapter.").  *Crawford*, 555 U.S. at 276.  The issue was whether protection should be extended to an employee who "speaks out about discrimination not on her own initiative, but in answering questions during" an investigation.  *Id.* at 273.  The Court held that the protection afforded by Title VII's opposition clause extends to an employee who answers questions during an employer's internal investigation.  *Id.*  In holding that the employee's actions were protected, the court rejected the Sixth Circuit's view that the opposition clause required an employee to actively instigate or initiate a complaint to be protected.  *Id.* at 277.  Although the Sixth Circuit's interpretation of the word "opposition" "obviously exemplified" the word "as commonly understood," the Supreme Court nevertheless determined that this court's interpretation did not represent "the limits of [the word]" and that "nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question."  *Id.* at 277–78.

## B.  *Kasten*'s Interpretation of the FLSA

In *Kasten*, 131 S. Ct. 1325 (2011), the Supreme Court considered the anti-retaliation provision of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, which forbids employers from retaliating "against any employee because such employee has filed any complaint . . . "  29 U.S.C. § 215(a)(3).  The issue in *Kasten* was whether the phrase "filed any complaint" includes oral as well as written complaints.  131 S. Ct. at 1329.

Kasten worked for Saint-Gobain Performance Plastics Corporation.  *Id.*  Saint-Gobain had placed employee timeclocks between the area where employees put on and took off their work-related protective clothing and the area where the employees actually worked.  The location of the clocks prevented workers from getting credit for the time they spent changing their clothes.  Kasten claimed Saint-Gobain discharged him because he orally complained to company officials that the location of the timeclocks violated the FLSA.  *Id.*

The district court granted summary judgment in favor of Saint-Gobain, concluding that the FLSA's anti-retaliation provision did not protect oral complaints. *Id.* The Seventh Circuit affirmed. *Id.* The Supreme Court granted certiorari to resolve a circuit split on the question whether oral complaints are protected under the FLSA § 215(a)(3) and reversed, holding that "the statutory term 'filed any complaint' includes oral as well as written complaints." *Id.* at 1329. Interpreting the phrase "filed any complaint," the Court noted that the interpretation *"depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." Id.* at 1330 (citing *Dolan v. Postal Service*, 546 U.S. 481, 486 (2006) (emphasis added)). The Court observed that while "the language of the provision, considered in isolation, may be open to competing interpretations. . . considering the provision in conjunction with the purpose and context leads us to conclude that only one interpretation is permissible." *Id.* at 1330–31.

The *Kasten* Court first considered the text of the statute, noting that "the word 'filed' has different relevant meaning in different contexts." *Id.* at 1331. In considering other possible interpretations of the word "filed," the Court examined dictionaries, regulations promulgated by other federal agencies, caselaw, other appearances of the word "filed" in the FLSA, *and other statutes' anti-retaliation provisions*. *Id.* at 1331–33. In looking beyond the FLSA to other statutes containing antiretaliation provisions, the court noted:

> Those statutes, however, use somewhat different language. *See, e.g.*, § 158(a)(4) (protecting an employee who has "filed charges or given testimony"); § 623(d) (protecting those who "*opposed* any [unlawful] practice" (emphasis added)); 42 U.S.C. §§ 2000e-3(a), 12203(a) (same); 29 U.S.C. § 2615(a)(2) (similar). See also, *e.g.*, 15 U.S.C. § 2087(a)(1) (2006 ed., Supp. III) ("*provided* . . . to the employer . . . *information* relating to any violation" (emphasis added)); § 2651(a) (similar); 30 U.S.C. § 815(c)(1) ("filed *or made* a complaint" (emphasis added)); 42 U.S.C. § 5851(a)(1)(A) ("*notified* his employer" (emphasis added)); 49 U.S.C. § 42121(a)(1) ("*provided* . . . *information*" (emphasis added)); § 60129(a)(1) (same).

*Kasten*, 131 S. Ct. at 1332–33. Given the use of broader language in other anti-retaliation statutes and the fact that the use of the word "filed" in § 215(a)(3) "lends itself linguistically to [a] broader, 'oral' interpretation," the Court concluded that the use of the broader language in other anti-retaliation statutes could mean 1) that Congress wanted to limit the scope of "filed" in

§ 215(a)(3) of the FLSA to writings, or 2) that Congress did not believe a different use of "filed" in anti-retaliation provisions outside of the FLSA made a significant interpretive difference.  *Id.* The Court noted that "[t]he bottom line is that the text, taken alone, cannot provide a conclusive answer to our interpretive question."  *Id.*

The *Kasten* Court looked further into "functional considerations" and decided that limiting § 215(a)(3) to written complaints would undermine the basic objectives of the FLSA. *Kasten*, 131 S. Ct. at 1333.  Limiting the scope of § 215(a)(3) to the filing of written complaints would "prevent Government agencies from using hotlines, interviews, and other oral methods of receiving complaints."  *Id.* at 1334.  Such a limitation would also "discourage the use of desirable informal workplace grievance procedures to secure compliance with the Act."  *Id.*

The need for effective enforcement of the FLSA led the Court to compare it to the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(4).  *Kasten*, 131 S. Ct. at 1334.  The Court noted that it had "broadly interpreted the language of the NLRA's antiretaliation provision" because of the need for effective enforcement of the NLRA.[1]  *Id.*  The similar enforcement needs of the NLRA and FLSA require an interpretation that provides "broad rather than narrow protection to the employee."  *Id.* (citing *NLRB v. Scrivener*, 405 U.S. 117, 122 (1972)).[2]  Based on these functional considerations, the Court determined that oral complaints are within the scope of FLSA   215(a)(3) so long as the complaint is "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."  *Id.* at 1335.  The Court further observed that "[g]iven Congress' delegation of enforcement powers to federal administrative agencies, we also give a degree of weight to their views about the meaning of this enforcement language."  *Id.*

---

[1]The Court "broadly interpreted the language of the NLRA's antiretaliation provision─'filed charges or given testimony,' 29 U.S.C. § 158(a)(4)Cas protecting workers who *neither* filed charges *nor* were 'called *formally* to testify' but simply 'participate[d] in a National Labor Relations Board investigation.'"  *Kasten,* 131 S. Ct. at 1334 (emphasis added by the Court).

[2]In addition, the *Scrivener* Court declined to read strictly the NLRA's reference to an employee who "has filed charges or given testimony," or confine "in its reach to formal charges and formal testimony."  *Scrivener*, 405 U.S. at 122.

## II. Sixth-Circuit Interpretation of Anti-Retaliation Provisions

Sixth Circuit precedent analyzing anti-retaliation provisions has not taken as restrictive a view as the majority does here. In *EEOC v. Ohio Edison Co.*, 7 F.3d 541, 545 (6th Cir. 1993), this court broadly construed the opposition provision of Title VII. *See* 42 U.S.C. § 2000e-3(a) (prohibiting retaliation against any employee or applicant for employment "because *he has opposed any practice* made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.") (emphasis added). This court read the phrase "he has opposed any practice" to mean "he or his representative has opposed any practice." *Id.* A broad reading of the provision was necessary, this court stated, because it was consistent with the purpose of the Act, which was to prohibit retaliation against protected activity. *Id.* This court also noted that other courts have "routinely adopted interpretations of retaliation provisions in employment statutes that might be viewed as outside the literal terms of the statute in order to effectuate Congress's clear purpose in proscribing retaliatory activity." *Id.*

This court has also liberally interpreted anti-retaliation provisions in other statutes similar to ERISA. In *EEOC v. Romeo Community Schools*, 976 F.2d 985, 989–90 (6th Cir. 1992), this court held that the FLSA's anti-retaliation provision, the precise provision at issue in *Kasten*, can be triggered by unsolicited internal complaints. *See* 29 U.S.C. § 215(a)(3) (prohibiting employers from retaliating "against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act."). The plaintiff, a female teacher, informally complained to the school district that she believed it was "breaking some sort of law" by providing higher wages to her male counterparts. 976 F.2d at 990. This court held the employee's informal complaint was protected under the Act, rejecting the defendant's argument that the FLSA § 215(a)(3) protects employee complaints only where the employer's retaliatory action takes place *after* the employee files an official complaint. *Romeo Cmty. Schools*, 976 F.2d at 990; *see also Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 142, 147 (6th Cir. 1977) (broadly interpreting the FLSA § 203(e) to include former employees, despite the FLSA amendment by Congress of the phrase "employee *includes*" to "employee *means*"); *NLRB v. Retail Store Emps. Union*, 570 F.2d 586, 590 (6th Cir. 1978) (broadly interpreting NLRB § 8(a)(4), which states that it is an unfair labor practice for an employer "to

discharge or otherwise discriminate against an employee because he has filed charges or given testimony," to protect employees who refuse to participate in an NLRB investigation). As the Secretary of Labor's amicus brief points out, Sixth Circuit precedent favors interpretations that grant broad protections to employees.

### III. The Circuit Split:  Circuits That Protect "Unsolicited Internal Complaints"
#### A.  Post-*Kasten* Interpretation of § 510

In *George v. Junior Achievement of Central Indiana, Inc.*, 694 F.3d 812, 815 (7th Cir. 2012), the Seventh Circuit explicitly held that § 510 protects an employee's unsolicited internal complaint.  The plaintiff in *George* noticed that his employer had failed to deposit money withheld from his paycheck into his retirement account.  *Id.* at 813.  George protested about this ERISA violation to various high-level executives of the company.  *Id.*  Eventually, he received checks that made up the missed deposits plus interest, but he was discharged within several months.  *Id.*  Like the Fifth and Ninth Circuits, the Seventh Circuit held that George's unsolicited internal complaints were protected "inquiries."

> Two other circuits have held that § 510 applies to unsolicited informal complaints.  *Anderson v. Electronic Data Systems Corp.*, 11 F.3d 1311, 1313, 1315 (5th Cir. 1994); *Hashimoto v. Bank of Hawaii*, 999 F.2d 408, 411 (9th Cir. 1993).  The ninth circuit stated that reporting misconduct is a necessary step in the commencement of any formal inquiry and that, unless informal beginnings are covered, employers would be induced to dismiss employees as soon as they complained or asked a barbed question.
> . . . .
> The statute does not specify who asks the question or, more generally, initiates the inquiry.  There is no linguistic reason why "inquiry" cannot refer to the employee's questions as well as the employer's.  Most questions (or observations) will lead to questions in return; after George complained, managers at Junior Achievement asked questions of him.  Treating § 510 as covering only half of the dialogue would not make sense.

*Id.* at 814, 815.  The *George* court rejected the Third Circuit's contention that § 510's language is unambiguous:

> Both the initial clauses in § 510 and the prepositional phrase that modifies them employ the disjunctive, which implies that informal and formal approaches are separate tracks, both of which are covered.  Section 510 can be parsed this way:
>> ((has given information) or (has testified or is about to testify))

        **in** (any ((inquiry) or (proceeding))).
Likewise we can group the actions and settings based on formality:
        ((has given information) **in** (any inquiry))
        or ((has testified or is about to testify) **in** (any proceeding)).

        This understanding about which words go with which other words is not compelled by rules of grammar—the language is ambiguous—but clues including the similar ordering of the informal and formal options lend support to splitting the provision into two parallel tracks.

. . . .

        Because § 510 refers to inquiries without specifying who is doing the inquiring, it logically covers employees' inquiries. *Crawford* provides some support for this understanding. .. Junior Achievement proposes to add modifiers such as "formal" or "solicited" to the word "inquiry" in § 510. Just as in *Crawford*, we must enforce the text as enacted, without the additions. *See also Kasten*, 131 S. Ct. at 1330. The grammatical structure and functions of § 510 do not support reading the statute as if it read: "for giving information . . . in response to any inquiry" (adding the italicized words to the enacted text). *Crawford* admonishes us to resist the urge to read words into statutes.

*George*, 694 F.3d at 814–16 (rejecting *Edwards v. A.H. Cornell & Son, Inc*., 610 F.3d 217, 224 (3rd Cir. 2010) (emphasis in original). *George* followed *Kasten* in deciding that "[w]hen dealing with ambiguous anti-retaliation provisions," a court must "resolve the ambiguity in favor of protecting employees." 694 F.3d at 814 (citing *Kasten*, 131 S. Ct. at 1333–35).

## B. Pre-*Kasten* Interpretation of § 510

        Before the Supreme Court decided *Kasten*, the Ninth Circuit considered a case involving an employee's unsolicited internal complaint in *Hashimoto v. Bank of Hawaii*, 999 F.2d 408 (9th Cir. 1993). Hashimoto was instructed by her co-workers to commit various ERISA violations. *Id*. at 409. After Hashimoto complained to other employees about "potential and/or actual violations by the Bank of the reporting and disclosure requirements and fiduciary standards of ERISA," she was discharged. *Id.* Although the controlling issue was whether Hashimoto's state claims were preempted, the Ninth Circuit noted that § 510 was "clearly meant to protect whistle blowers" in Hashimoto's position. *Id.* at 411. The court stated that the "normal first step in giving information or testifying" was "to present the problem first to the responsible managers of the ERISA plan." *Id.* If an employee "is then discharged for raising the problem, the process of

giving information or testifying is interrupted at its start: the anticipatory discharge discourages the whistle blower before the whistle is blown." *Id*.

The Fifth Circuit interpreted § 510 as protecting unsolicited internal complaints in *Anderson v. Electronic Data Systems Corp.*, 11 F.3d 1311 (5th Cir. 1994). Anderson was asked by a specific employee to commit various ERISA violations. *Id.* at 1312. After Anderson refused and reported the alleged ERISA violations to management, he was demoted and discharged. *Id.* Similar to the Ninth Circuit in *Hashimoto*, the Fifth Circuit in *Anderson* focused on the ERISA preemption issue, but noted that § 510 protects employees, like Anderson, who "provid[e] information or testimony relating to ERISA." *Id.* at 1315.

### IV.  Circuits That Do Not Protect Unsolicited Internal Complaints

Every circuit court case that interprets § 510 protection as not protecting an employee's unsolicited internal complaint was decided pre-*Kasten*. But After *Kasten*, the Fourth Circuit in a FLSA retaliation case followed the Supreme Court's guidance on statutory interpretation.

### A.  Pre-*Kasten* Interpretation of § 510

The Fourth Circuit in *King v. Marriott Int'l, Inc.*, 337 F.3d 421 (4th Cir. 2003), held that unsolicited internal complaints are not protected under § 510. King had learned of potential ERISA violations and reported them to her immediate supervisor. Instead of remedying the violations, the supervisor promoted King and gave her increased responsibilities regarding benefit plan finances. When the supervisor revived his potentially violative plan, King objected again and shared her objections with two in-house attorneys in addition to her supervisor. *Id.* When the supervisor revived his plan a third time, King objected again, orally and in writing, and was fired, purportedly for feuding with other employees. *Id.* The Fourth Circuit concluded that King's complaints were not protected under § 510:

> In interpreting a very similar provision of the Fair Labor Standards Act . . . [3] we concluded that the term "proceeding" referred only to administrative or legal proceedings, and not to the making of an intra-company complaint. *See Ball* v. *Memphis Bar-B-Q Co.*, 228 F.3d 360, 364 (4th Cir. 2000). In *Ball*, we said that

---

[3] The provision forbids employers from retaliating "against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act." 29 U.S.C. § 215(a)(3).

"the 'proceeding' necessary for liability . . . refers to procedures conducted in judicial or administrative tribunals," noting that "proceeding," in the Act, was "modified by attributes of administrative or court proceedings." In particular, we explained, "testify" and "institute" both connote "a formality that does not attend an employee's oral complaint to his supervisor."

*King*, 337 F.3d at 427. The *King* court determined that § 510 of ERISA, like the FLSA provision interpreted in *Ball*, was "much narrower" than other anti-retaliation provisions, such as found in Title VII, and required a stricter interpretation. *King*, 337 F.3d at 427 (citing *Ball,* 228 F.3d at 364, and *Ball*'s reference to Title VII's anti-retaliations provision, 42 U.S.C. § 2000e-3(a) (making it unlawful for an employer to discriminate against an employee because he has opposed any practice made unlawful by the Act.)) The court interpreted § 510 protections to be limited to the legal or administrative proceedings, "or at least to something more formal than written or oral complaints made to a supervisor." *Id.* at 427.

In *Edwards v. A.H. Cornell & Son, Inc.*, the Third Circuit followed *King* and held that § 510 of ERISA does not protect an employee's unsolicited internal complaint. 610 F.3d 217 (3rd Cir. 2010). Edwards discovered ERISA violations, "objected to and/or complained" about them to her company's "management," and was later fired. *Id.* at 219. In holding that Edwards' complaints were not protected, the Third Circuit determined that § 510 only protects employer-initiated inquiries. *Id.* at 223. The Third Circuit held § 510 "plain and unambiguous," and not "reasonably susceptible of different interpretations." *Id.* at 222 (internal citations omitted). The *Edwards* court interpreted § 510 as granting protection only where there is an employer-initiated request for information. *Id.* at 223.

The Second Circuit also denied § 510 protection to unsolicited internal complaints in *Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325 (2d Cir. 2005). Nicolaou discovered a "serious payroll discrepancy" that she believed put her company in violation of ERISA. *Id.* at 326. She brought the discrepancy to the attention of the Chief Financial Officer and Controller, and eventually felt compelled to inform "outside counsel" for the company, who conducted his own investigation and agreed with Nicolaou. *Id.* Nicolaou and the attorney then met with the President of the company, who reassigned Nicolaou, after which her employment was terminated. Because the district court record did not reflect whether the President of the company arranged the meeting, the Second Circuit remanded to the district court to decide whether

Nicolaou could "demonstrate that she was contacted to meet with [the President] *in order to give information about* the alleged underfunding of the Plan." *Id.* at 330 (emphasis added). The Court decided that the "informal gathering of information falls within the plain meaning of 'inquiry,'" and was protected by § 510. *Id.* at 329. Thus, if Nicolaou could demonstrate that she was *contacted by her employer* "to give information about the alleged underfunding of the Plan, her actions would fall within the protection of Section 510." *Id.* at 330. The Court limited § 510 protection to employees who give information in employer-initiated inquiries. The *Nicolaou* court did not consider Nicolaou's actions before her meeting with the President as relevant under § 510.

The Second Circuit based its conclusions on the "plain language" of § 510. *Nicolaou*, 402 F.3d at 328. The court refused to recognize any similarities to the FLSA, 29 U.S.C. § 215(a)(3),[4] as ERISA § 510 was "unambiguously broader in scope." *Nicolaou*, 402 F.3d at 328. The *Nicolaou* court noted that its holding did not conflict with the Fourth Circuit's *King* decision. *Id.* at 421. The court recognized *King*'s interpretation that "Section 510's use of the phrase 'inquiry or proceeding'" reached only "the legal or administrative, or at least . . . something more formal than written or oral complaints made to a supervisor." *Nicolaou*, 402 F.3d at 330 (citing *King*, 337 F.3d at 427). The *Nicolaou* court, however, stated "the proper focus is not on the formality or informality of the circumstances under which an individual gives information, but rather on whether the circumstances can fairly be deemed to constitute an 'inquiry,'" and focused on whether the employer initiated the inquiry. *Id.*

### B. Post-*Kasten* Statutory Interpretation in the Fourth Circuit

No circuit court interpreting § 510 of ERISA as failing to protect an employee's unsolicited internal complaints has returned to the question post-*Kasten*. In *Minor v. Bostwick Laboratories, Inc.*, 669 F.3d 428 (4th Cir. 2012), however, the Fourth Circuit (post-*Kasten*) broadly interpreted § 215(a)(3) of the FLSA to protect an employee's unsolicited internal complaint.

The issue in *Minor* was whether an employee's internal complaint could trigger the protection of § 215(a)(3). *Minor*, 669 F.3d at 431. Minor argued that *Kasten* requires a holding

---

[4]That is the same provision of the FLSA the Court later interpreted in *Kasten*.

that protects "intracompany complaints" under § 215(a)(3). *Id.* Her employer argued that *Ball*, 228 F.3d 360 (4th Cir. 2000), was controlling, rather than *Kasten*, and that *Ball* "compell[ed] the conclusion that intracompany complaints are unprotected." *Minor*, 669 F.3d at 431. In the alternative, both parties argued that the plain language of § 215(a)(3) supported their respective positions. *Id.*

The Fourth Circuit held that "although the language of § 215(a)(3) is ambiguous, the remedial purpose of the statute requires that it protect from retaliation employees who file intracompany complaints." *Id.* at 432. It explained that *Kasten*'s reasoning was "persuasive" but not "directly controlling," as the Supreme Court had "expressly declined to address the question of whether an intracompany complaint could qualify as protected activity under the FLSA." *Id.* (citing *Kasten*, 131 S. Ct. at 1336). The Fourth Circuit distinguished *Kasten* from *Ball* by breaking down the FLSA's anti-retaliation provision into three clauses, interpreting the phrase "filing any complaint" in § 215(a)(3) as the "complaint clause." *Minor*, 669 F.3d at 433. The court stated that § 215(a)(3) protects three distinct types of activities; (1) filing any complaint, (2) instituting or causing to be instituted any proceeding, and (3) testifying or being about to testify in any such proceeding. *Id.* at 433. The *Minor* court stated it had "specifically noted in *Ball* that our opinion did not purport to construe the 'complaint clause.'" *Id.* (citing *Ball*, 228 F.3d at n.*).

Determining that neither *Kasten* nor *Ball* were "directly controlling," the Fourth Circuit turned "to an independent review of the language of § 215(a)(3)." *Minor*, 669 F.3d at 434. The court noted that, unlike the district court, it now had "the benefit of the Supreme Court's recent consideration of the plain meaning of 'filed any complaint' from *Kasten*." *Id.* at 435. Using *Kasten* as a guide, the court concluded "that the language 'filed any complaint' is ambiguous with regard to whether intracompany complaints are protected activity under § 215(a)(3)." *Id.* The court declined to overrule its statement in *Ball* that the term "proceeding" in § 215(a)(3) referred only to administrative or legal proceedings and not to the making of an intra-company complaint, on the ground that *Ball* did not involve the complaint clause of § 215(a)(3) and that it was Congress' intent to consider each category of protected activity separately. *Id.* at 436.

Because the term "filed any complaint" in § 215(a)(3) is ambiguous, the Fourth Circuit turned to the "functional considerations" considered in *Kasten*, 131 S. Ct. at 1333, and found that those considerations "dictate that intracompany complaints qualify as protected activity within the meaning of the FLSA's antiretaliation provision." *Id.* at 437. The *Minor* court considered the FLSA's basic goals, including that it was enacted to combat labor conditions detrimental to the well-being of workers, that Congress had included the anti-retaliation provision so that employees would not have to fear economic retaliation for reporting violations, and that limiting the provision's coverage to complaints made only to an administrative or adjudicative body would undermine the purpose of the FLSA. *Id.* An interpretation of § 215(3)(a) that protected intracompany complaints, "on the other hand, comports with the statute's objectives as described by Congress's findings and the Supreme Court's interpretation of those findings." *Id.* at 437.

## V. Analysis

The threshold question is whether § 510 is reasonably susceptible of different interpretations. *Kasten*, 131 S. Ct. at 1330–31 (observing that an anti-retaliation provision is ambiguous if "the language of the provision, considered in isolation, may be open to competing interpretations."); *see also Edwards*, 610 F.3d 217 at 222. If § 510 is ambiguous regarding whether it protects unsolicited internal complaints, *Kasten* counsels that its interpretation "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Kasten*, 131 S. Ct. 1325, 1330 (citing *Dolan,* 546 U.S. at 486).

The circuit split and divergent opinions regarding whether § 510 protects an employee's unsolicited internal complaints suggest an ambiguity. *See Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 739 (1996) (in light of different interpretations in state supreme courts and federal circuit courts, the court found it difficult "to contend that the word 'interest' in the National Bank Act is unambiguous . . ."); *North Fork Coal Corp. v. Fed. Mine Safety & Health Review Comm'n*, 691 F.3d 735, 740 (6th Cir. 2012) (the fact that the phrase "pending final order on the complaint" of 30 U.S.C. § 815(c)(3) "does not have a plain meaning" and "is subject to more than one reasonable interpretation" was demonstrated by the competing interpretations

offered by the parties, and noting that "the existence of divergent court opinions also suggests ambiguity.").

*Kasten* has important implications for interpreting § 510. In both *King* and *Edwards*, which relies on *King*'s reasoning, § 510 protection was limited to employees who give information in "something more formal than written or oral complaints made to a supervisor." *King*, 337 F.3d at 427; *Edwards*, 610 F.3d at 223 ("even beyond the plain meaning of 'inquiry' and 'proceeding,' the phrase 'testified or is about to testify' implies that the phrase 'inquiry or proceeding' is limited to more formal actions.") Relying on another pre-*Kasten* case, *Ball*,[5] the *King* court determined that § 510 of ERISA, like the anti-retaliation provision of the FLSA interpreted in *Ball*, was "much narrower" than other anti-retaliations provisions, requiring a stricter interpretation of § 510. *Id.* *King* interpreted § 215(a)(3) of the FLSA--the same whistleblower provision the Supreme Court interpreted a decade later in *Kasten*. But *Kasten* interpreted the provision to protect employees who make informal oral or written complaints. 131 S. Ct. at 1335.

The Second Circuit in *Nicoloau* focused less on the formality of the inquiry and more on the importance of the inquiry being "employer-initiated." 402 F.3d at 330. In fact, the *Nicoloau* court observed that ERISA's § 510 is "unambiguosly broader in scope" than the FLSA's § 215(a)(3). *Id.* at 328. However, none of these statements take away from the fact that the court did not believe its holding conflicted with *King*'s reasoning, or that it based its conclusions on the "plain language" of § 510. *Id.* In fact, *Nicoloau*'s holding calls for a broader interpretation of § 510 than *King* and *Edwards*, with its statement that the "plain language of ERISA Section 510" is "unambiguously broader in scope" than the FLSA's § 215(a)(3). *Id.* at 328. Following the court's own reasoning, if *Nicoloau* had been decided post-*Kasten* the Second Circuit would interpret § 510 of ERISA to protect an employee's unsolicited internal complaint, since *Kasten* interpreted § 215(a)(3) of the FLSA to afford broad protections for employees.

After the Supreme Court decided *Kasten*, the Fourth Circuit held that § 215(a)(3) of the FLSA protects an employee's unsolicited internal complaints in *Minor*, 669 F.3d at 439. The Fourth Circuit noted that it had adopted the majority view, which included the Sixth Circuit, on

---

[5]*Ball,* 228 F.3d 360, 364 (4th Cir. 2000).

the same issue. *Id.* at 438 (citing *Romeo Cmty. Schools*, 976 F.2d at 989). However, after *Kasten* the Fourth Circuit's *Minor* and *King* decisions cannot be reconciled. *Compare King*, 337 F.3d at 427 (relying on *Ball* in its determination that § 510 of ERISA and § 215(a)(3) of the FLSA require a strict, narrow interpretation), *with Minor*, 669 F.3d at 435–37 (distinguishing *Ball* from *Kasten* and using *Kasten* as a guide in determining that § 215(a)(3) of the FLSA was ambiguous and that functional considerations dictated "that intracompany complaints qualify as protected activity."). *Minor* is noteworthy because the only two other circuits to interpret ERISA's § 510 as not protecting an employee's unsolicited internal complaint relied on the Fourth Circuit's reasoning in *King*.

## VI.

The district court decided this case primarily on the basis that Sexton's email was not an inquiry. The majority makes this point as well. Initially, Sexton inquired of the Human Resources manager as to the results of the election. After confirming that the employees had received the most votes, he sent the email to the board chairman. The majority concedes that Sexton gave information in the email, but concludes that it was not given in an inquiry. I agree with the Secretary that a complaint may, in context, be an inquiry, and that Sexton was clearly asserting that Panel Processing had violated ERISA and inquiring whether the board would take action or Sexton would be required to do so. Sexton argues that Panel Processing responded to that inquiry by firing him.

## VII.

Section 510 is susceptible of several interpretations, only one of which is that employee information must be given 1) at the employer's initial request and/or 2) in "something more formal than written or oral complaints," in order to be protected. *See, e.g., King*, 337 F.3d at 427. I would follow *George*, the only circuit court decision issued after *Kasten*. 694 F.3d at 814 ("When dealing with ambiguous anti-retaliation provisions, we are supposed to resolve the ambiguity in favor of protecting employees." (citing *Kasten*, 131 S. Ct. at 1333–35)); *see also Crawford*, 555 U.S. at 277–78 ("nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.")